UNITED STATES of America,
Plaintiff–Appellee,

v.

Richard ANNIGONI, Defendant–
Appellant.

No. 94–50422.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 4, 1995.

Filed June 8, 1995.

Amended Sept. 21, 1995.

Order Granting Rehearing En Banc

Jan. 10, 1996.

Argued and Submitted March 21, 1996.

Decided Sept. 23, 1996.

Michael Tanaka, Deputy Federal Public Defender, Los Angeles, CA, for defendant-appellant.

Miriam A. Krinsky and Daniel P. Collins, Assistant United States Attorneys, Los Angeles, CA, for plaintiff-appellee.

Before: HUG, Chief Judge, and FLETCHER, POOLE, BEEZER, BRUNETTI, KOZINSKI, THOMPSON, LEAVY, T. G. NELSON, KLEINFELD, and HAWKINS, Circuit Judges.

Opinion by Judge HAWKINS; Dissent by Judge LEAVY; Dissent by Judge KOZINSKI.

MICHAEL DALY HAWKINS, Circuit Judge:

This case asks us to reconsider the long-standing principle that automatic reversal of a conviction is the proper remedy where a trial court erroneously deprives a criminal defendant of the right of peremptory challenge.

Following a jury trial, defendant-appellant Richard Annigoni ("Annigoni") was convicted of bank fraud in violation of 18 U.S.C. § 1344. Annigoni appealed his conviction on two grounds. He challenged the district court's pre-trial ruling limiting cross-examination of a government witness, and challenged the district court's refusal, on *Batson*[1] grounds, to allow him to exercise a peremptory challenge to remove an Asian-American juror from the panel. He argued that the district court had erroneously denied his right of peremptory challenge, and that reversal of his conviction was therefore required.

---

1. *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

A three-judge panel of this Circuit affirmed Annigoni's conviction. *United States v. Annigoni,* 57 F.3d 739 (9th Cir.1995), *as amended,* 68 F.3d 279. The panel upheld the district court's decision to limit the scope of cross-examination of the government witness. It went on to find that the district court had erred in denying Annigoni's peremptory challenge, but concluded that the error did not require automatic reversal of his conviction. Applying a harmless-error analysis, the panel concluded that the error in Annigoni's case was harmless because Annigoni "failed to show that any juror challengeable for cause sat on his case. He lost one peremptory he should have had. He did not lose an impartial jury." *Annigoni,* 68 F.3d at 285.

■ Annigoni petitioned this Court for rehearing en banc pursuant to Federal Rule of Appellate Procedure 40. We granted rehearing to consider whether the erroneous denial of Annigoni's right of peremptory challenge required automatic reversal. For reasons discussed below, we reverse the district court and hold that the erroneous denial of a criminal defendant's right of peremptory challenge requires automatic reversal.

## FACTS

### I. Events underlying Annigoni's indictment

Annigoni's conviction arises out of a series of fraudulent financial transactions that secured him a $2.85 million loan on which he and his associates later defaulted. The transactions centered on the purchase of an office building in Anaheim, California. The office building was constructed by El Rancho North, a partnership that financed the project with a $1.45 million loan from Prudential Insurance Company. At the time of the transactions underlying this case, El Rancho still owed Prudential approximately $950,000 on the loan.

In conjunction with co-defendant Ronald Fauria, a senior vice-president of Orange Coast Title Company, and James Perumean, a dentist and real estate investor, Annigoni formed a limited partnership. Annigoni's and Fauria's interests were concealed, while Perumean acted as front man for the limited partnership.

On behalf of the limited partnership, Perumean sought a $2.85 million loan from the United California Savings Bank. In applying for the loan, Perumean represented to the bank that the partnership had the chance to buy the property for $4 million. He told the bank that the partnership needed a $2.85 million loan to acquire title to the property and to pay off the first trust deed holder, Prudential Insurance Company. Perumean represented to the bank that the loan would be secured by that first trust deed. Perumean also represented to the bank that the property was owned by Par Western Interests, Inc., a company Annigoni owned.

In fact, Par Western did not own the property, but manipulated escrow accounts at Orange Coast Title Company to mislead the bank. The scheme worked as follows: Par Western arranged to acquire the property on the same day it was due to be sold to the limited partnership. Fauria set up a double escrow account at the title company to handle two closings on the property simultaneously. In the first escrow, Par Western purportedly delivered title to the limited partnership. The bank simultaneously transferred the $2.85 million in loan proceeds to a second escrow. Of that $2.85 million, $1.84 million was paid to the property's true owner, El Rancho North; the rest of the cash was disbursed to Annigoni's wife, in-laws, and lawyers, as well as to Fauria.

Contrary to Perumean's representations to the bank, the limited partnership never paid off the first trust deed. Duped by false documents, the bank did not discover the fraud until two years later, when the borrowers defaulted on the loan.

Appellant Annigoni and co-defendant Fauria were indicted for defrauding a bank in violation of 18 U.S.C. § 1344 and for aiding and abetting in the making of a false statement to a federally-insured bank in violation of 18 U.S.C. § 1014.

### II. Jury selection

The rehearing of this appeal arises out of the district court's denial of one of Annigoni's

peremptory challenges during jury selection. In the proposed voir dire questions Annigoni submitted to the district court, he included the following question: "Have you, or has anyone close to you, ever joined a limited partnership?" When the district court posed that question to the jury panel, potential juror Jue Hom raised his hand and the following colloquy ensued:

THE COURT: Tell me a little bit about that experience.

MR. HOM: I have a joint partnership with the brokerage house—Merrill Lynch.

THE COURT: You invested in one of the Merrill Lynch limited partnerships?

MR. HOM: Yes.

THE COURT: All right. Was that in oil and gas or real estate, or what type of investment was it?

MR. HOM: Mostly it's properties.

THE COURT: And your investment in that is strictly as a passive investor?

MR. HOM: Yes, sir.

The district court next asked the jury pool whether any of them had been involved in litigation. Two potential jurors raised their hands, including Mr. Hom, who engaged the court in the following colloquy:

MR. HOM: Yes, on that investment through Merrill Lynch, I don't know if they have any allegation going on at this time which I don't know anything about—in the partnership.

THE COURT: All right. Do you suspect that there was any litigation regarding that investment? Have you received any notices about it?

MR. HOM: Not one in the past three months or so.

THE COURT: All right. How about in the past year?

MR. HOM: I have taken no action on that.

When the defense attempted to exercise a peremptory challenge against Mr. Hom, the government objected pursuant to *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), which prohibits the use of peremptory challenges in a racially discriminatory manner.[2] During a sidebar conference, the following colloquy occurred:

THE COURT: All right, what's your reasons?

MR. ANDRES (Counsel for Fauria): He has conservative investments. He has—I think he has various limited partnerships and investments. Because of his investment background, I think that it would be in my client's best interest to have him excused from this jury.

THE COURT: He's Asian.

MR. ANDRES: I understand that, and I think the Prosecution has kicked off number three, who was an Asian lady first strike out of the box. I don't think we've struck any Asian prospective jurors.

MS. SUN (Counsel for Annigoni): Your Honor, can I just add to that? I believe the exchange between the Court and Mr. Hom was as follows—he indicated he hadn't received any notices about legal action within the last three months. The Court then said, "Within the last year?", and I think his answer was, "I didn't take any action about those", which suggests to me that he did get more information and, perhaps, just wasn't willing to share. That made him, to me—that gave me some concern about the extent of those kinds of activities that he's engaged in.

MS. LUM (the Prosecutor): Your Honor, I don't—I didn't interpret his answer that way. I don't think he's been involved in any litigation and there have been numerous minorities that have been on the panel and that have been struck by the Defen-

---

**2.** *Batson* and its progeny require a three-step process for challenging a peremptory strike: (1) The party opposing the peremptory strike must make a prima facie showing that the proposed peremptory strike is racially discriminatory, taking account of "all the relevant circumstances[.]" (2) The burden then shifts to the proponent of the strike to come forward with a race-neutral explanation for the strike. (3) Finally, if a race-neutral explanation is tendered, the trial court must decide whether the party opposing the strike has proved purposeful racial discrimination. *Batson*, 476 U.S. at 96–98, 106 S.Ct. at 1722–24; *See also Hernandez v. New York*, 500 U.S. 352, 358–59, 111 S.Ct. 1859, 1865–66, 114 L.Ed.2d 395 (1991) (explaining the three-step *Batson* analysis); *Purkett v. Elem*, —— U.S. ——, ———— ——, 115 S.Ct. 1769, 1770–71, 131 L.Ed.2d 834 (1995) (same).

dants. The fact that he is involved in limited partnerships—and it was in a very, very tangential way—he barely knew what it involved. I don't think that's sufficient reason to challenge.

THE COURT: I'm not going to allow the exercise of the peremptory challenge because I think it's racially motivated.

As a result of the district court's refusal to allow Annigoni to use one of his peremptory strikes, Mr. Hom was seated as a member of the jury that convicted Annigoni of bank fraud.

■ On appeal, the panel quickly disposed of the issue Annigoni raised: whether the district court erred when it denied the defense's attempt to exercise a peremptory strike against Mr. Hom.[3] Noting that the district court's sole finding on the issue of discrimination was its observation, "He's Asian," the panel concluded that it was error to deny Annigoni a peremptory strike based on "the bare fact of a male juror of Asian heritage." Although it acknowledged that a defendant may not use a peremptory challenge to discriminate on the basis of race, the panel invoked the Supreme Court's recent decision in *Purkett v. Elem*, —— U.S. ——, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995), which established that unless a discriminatory intent is inherent in the explanation a litigant offers to defend a peremptory challenge, " 'the reason offered will be deemed race neutral.' " *Purkett*, —— U.S. at ——, 115 S.Ct. at 1771 (*quoting Hernandez v. New York*, 500 U.S. 352, 360, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991)). Applying *Purkett*, the panel concluded that Annigoni's defense attorney had offered an entirely plausible explanation for the proposed peremptory challenge: she wished to remove Mr. Hom because of his investment in a limited partnership that had been involved in litigation. Although that explanation did not, in the panel's view, rise to the level of "cause for challenge[,]" nonetheless it satisfactorily re-

butted the government's *Batson* challenge, since it was "distinct ... from a manifestation of racial prejudice." *Annigoni*, 68 F.3d at 283.

We have long followed a rule requiring automatic reversal for errors of this kind. *See United States v. Turner*, 558 F.2d 535 (9th Cir.1977). While no intervening case has challenged its automatic reversal rule, *Turner* was decided prior to *Batson* and recent cases concerning the proper remedy for trial errors. Relying upon these recent trends, the panel analyzed the district court's error under a harmless-error standard, and concluded that the error here was harmless. The issue before us on rehearing is whether a harmless-error analysis is the appropriate standard to use in reviewing the erroneous deprivation of a defendant's right of peremptory challenge.

## ANALYSIS

### I. The law of peremptory challenges

#### A. The right of peremptory challenge

The peremptory challenge is one of the oldest established rights of the criminal defendant.[4] For more than a century, the Supreme Court has recognized that "[the] making of [peremptory] challenges [is] an essential part of the trial[,]" *Lewis v. United States*, 146 U.S. 370, 376, 13 S.Ct. 136, 138, 36 L.Ed. 1011 (1892), and has described the right of peremptory challenge as "one of the most important of the rights secured to the accused." *Pointer v. United States*, 151 U.S. 396, 408, 14 S.Ct. 410, 414, 38 L.Ed. 208 (1894). The significance of the right is underscored by the extraordinary remedy courts have traditionally afforded to defendants deprived of the right: reversal of conviction, without a showing of prejudice. *Lewis*, 146 U.S. at 376, 13 S.Ct. at 138. Courts have adhered to this remedy for well over a century. *See Harrison v. United*

---

**3.** We review for clear error a district court's findings of fact as to the racially discriminatory use of peremptory challenges. *United States v. De Gross*, 960 F.2d 1433, 1442 (9th Cir.1992) (en banc).

**4.** Although we decide this case in the context of the rights of a defendant, the peremptory challenge is an equally important tool to insure that the government receives a fair trial. *Purkett v. Elem*, —— U.S. ——, ——, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834 (1995) (upholding prosecutor's use of peremptory strike).

*States,* 163 U.S. 140, 142, 16 S.Ct. 961, 961, 41 L.Ed. 104 (1896); *Gulf, Colorado & Santa Fe Ry. Co. v. Shane,* 157 U.S. 348, 351, 15 S.Ct. 641, 642, 39 L.Ed. 727 (1895); *Swain v. Alabama,* 380 U.S. 202, 212, 85 S.Ct. 824, 831, 13 L.Ed.2d 759 (1965), *overruled on other grounds by Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

Peremptory challenges, along with challenges for "cause," are the principal tools that enable litigants to remove unfavorable jurors during the jury selection process. The central function of the right of peremptory challenge is to enable a litigant to remove a certain number of potential jurors who are not challengeable for cause, but in whom the litigant perceives bias or hostility. "The function of the [peremptory] challenge is not only to eliminate extremes of partiality on both sides, but to assure the parties that the jurors before whom they try the case will decide on the basis of the evidence placed before them, and not otherwise." *Swain,* 380 U.S. at 219, 85 S.Ct. at 835. A related and equally important purpose of peremptory challenges is to reassure litigants—particularly criminal defendants—of the fairness of the jury that will decide their case. More than two centuries ago, Blackstone declared the peremptory challenge "necessary . . . that a prisoner . . . should have a good opinion of his jury, the want of which might totally disconcert him," and stated that "the law wills not that he should be tried by any one man against whom he has conceived a prejudice, even without being able to assign a reason for such dislike." Blackstone, 4 *Commentaries* 353 (1st ed. 1769).

While not guaranteed by the Constitution, *Stilson v. United States,* 250 U.S. 583, 586, 40 S.Ct. 28, 29–30, 63 L.Ed. 1154 (1919), the right of peremptory challenge is nonetheless an important statutory right that courts have considered vital to an impartial jury trial.[5] The Supreme Court has recognized the right of peremptory challenge as "essential . . . to the impartiality of the trial[,]" *Lewis,* 146 U.S. at 378, 13 S.Ct. at 139 (citations omitted), and has noted that "[t]he persistence of peremptories and their extensive use demonstrate the long and widely held belief that peremptory challenge is a necessary part of trial by jury." *Swain,* 380 U.S. at 219, 85 S.Ct. at 835. Indeed, in a recent decision, Justice Scalia, writing for the Court, suggested that the Sixth Amendment "requirement of an 'impartial jury' *impliedly compels* peremptory challenges[.]" *Holland v. Illinois,* 493 U.S. 474, 482, 110 S.Ct. 803, 808, 107 L.Ed.2d 905 (1990) (emphasis added).

In addition to allowing litigants to strike jurors in whom they perceive a bias, peremptory challenges also serve to reinforce challenges for cause. Peremptory challenges enhance the right to challenge jurors for cause because they allow litigants to strike prospective jurors who may have become antagonized by probing questions during voir dire. During voir dire, potential jurors are questioned about a wide range of subjects in an attempt to ferret out possible "causes" to challenge particular jurors. Despite admonitions to the contrary, vigorous questioning of potential jurors can foster hostility, since questions frequently require jurors to reveal deeply personal information in the presence of other potential jury members: marital

---

**5.** Although the right of peremptory challenge does not derive from the Constitution, it nonetheless is a "venerable" tradition dating back centuries. *Holland v. Illinois,* 493 U.S. 474, 480, 110 S.Ct. 803, 807, 107 L.Ed.2d 905 (1990). As described in *Lewis,* "[t]he right of challenge comes from the common law with the trial by jury itself, and has always been held essential to the fairness of trial by jury." *Lewis,* 146 U.S. at 376, 13 S.Ct. at 138. The right of peremptory challenge has "very old credentials[.]" *Swain,* 380 U.S. at 212, 85 S.Ct. at 831. At common law, the defendant in a felony trial was allowed a certain number of peremptory challenges; by the seventeenth century, prosecutors, too, were allowed to remove potential jurors peremptorily.

*Swain,* 380 U.S. at 213, 85 S.Ct. at 832 (citing The Ordinance for Inquests, 33 Edw. 1, Stat. 4 (1305)). Shortly after the founding of the United States, an early Congress codified the English common law of peremptory challenges in a 1790 statute. *Holland,* 493 U.S. at 481, 110 S.Ct. at 807–08 (citing Act of Apr. 30, 1790, ch. 9, § 30, 1 Stat. 112, 119 (1790)) (granting defendants 20 peremptory challenges in felony trials). Several states patterned peremptory challenge statutes after the federal model. *Swain,* 380 U.S. at 215–16, 85 S.Ct. at 833–34. Today, the right of peremptory challenges in federal criminal trials is guaranteed by Federal Rule of Criminal Procedure 24(b).

status, education, age, occupation, details about family members, financial information, involvement in past lawsuits, criminal records, " 'habits and associations[,]' " *Swain,* 380 U.S. at 220, 85 S.Ct. at 836 (quoting *Hayes v. State of Missouri,* 120 U.S. 68, 70, 7 S.Ct. 350, 351, 30 L.Ed. 578 (1887)), personal opinions on a range of subjects, and other intimate details.[6]

The important interplay between challenges for cause and peremptory challenges has long been recognized. *See Swain,* 380 U.S. at 218–19, 85 S.Ct. at 835 (voir dire "tends to be extensive and probing[,]" and "operat[es] as a predicate for the exercise of peremptories[.]"). Blackstone was acutely aware of this dynamic, observing that "upon challenges for cause shown, if the reason assigned prove insufficient to set aside the juror, perhaps the bare questioning his indifference may sometimes provoke a resentment; to prevent all ill consequences from which, the prisoner is still at liberty, if he pleases, peremptorily to set him aside." Blackstone, 4 *Commentaries* 353. As the Supreme Court has explained: "[T]he *very availability of peremptories* allows counsel to ascertain the possibility of bias through probing questions on the voir dire and facilitates the exercise of challenges for cause by removing the fear of incurring a juror's hostility through examination and challenge for cause." *Swain,* 380 U.S. at 219–20, 85 S.Ct. at 835 (emphasis added).

■ Although the two challenges work in tandem, peremptory challenges differ considerably from challenges for cause. Challenges for cause, while unlimited in number, allow the removal of panel members only "on a narrowly specified, provable, and legally

cognizable basis of partiality," *id.* at 220, 85 S.Ct. at 836, such as a personal relationship with a party, witness, or attorney in the litigation, or a biased state of mind concerning a party or issue in the case. The number of prospective jurors who may be excused for cause is unlimited. 28 U.S.C. § 1870. Challenges for cause require the challenging party to articulate clearly on the record the precise reason for challenging the potential juror, but the decision whether to exclude a panel member for cause is vested in the trial court. *Gray v. Mississippi,* 481 U.S. 648, 652 n. 3, 107 S.Ct. 2045, 2048 n. 3, 95 L.Ed.2d 622 (1987) ("[M]otion to excuse a venire member for cause . . . must be supported by specified causes or reasons that demonstrate that, as a matter of law, the venire member is not qualified to serve.").

■ Peremptory challenges, in contrast, are limited in number,[7] and have traditionally been exercised according to the unfettered discretion of the litigant. A party seeking to exercise a peremptory challenge is generally not required to give a reason for its use, and may exercise peremptory challenges without judicial approval. Over a century ago, the Supreme Court characterized the peremptory challenge as "an arbitrary and capricious species of challenge to a certain number of jurors[,]" which may be made "without showing any cause at all." *Lewis,* 146 U.S. at 376, 13 S.Ct. at 138 (citations omitted). More recently, the Court explained: "The essential nature of the peremptory challenge is that it is one exercised without a reason stated, without inquiry and without being subject to the court's control." *Swain,* 380 U.S. at 220, 85 S.Ct. at 836.[8] The Supreme Court ex-

---

6. Although the potential for juror hostility is greater where counsel conducts or participates in voir dire, it is also present where the trial court alone conducts the inquiry.

7. Federal Rule of Criminal Procedure 24(b) provides the following peremptory challenges: In capital cases, both the government and the defendant are entitled to twenty peremptory challenges. In felony cases, the defendant is allowed ten peremptory challenges while the government is allowed six. Finally, in misdemeanor cases, each side is allowed three peremptory challenges.

8. As discussed below, the sole restriction on the use of peremptory challenges is that neither side may exercise a challenge on the basis of the race, gender, or ethnicity of the challenged juror. *See Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); *J.E.B. v. Alabama,* 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994); *Hernandez v. New York,* 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991). The trial court must determine whether a proposed challenge violates the precept of *Batson,* but the challenging party need only offer a cursory explanation to survive a *Batson* objection. *Purkett v. Elem,* —— U.S. ——, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995).

plained the distinction between the two challenges in this fashion: "While challenges for cause permit rejection of jurors *on a narrowly specified, provable and legally cognizable basis of partiality,* the peremptory permits rejection *for a real or imagined partiality that is less easily designated or* demonstrable." *Id.* at 220, 85 S.Ct. at 836 (citing *Hayes,* 120 U.S. at 68, 7 S.Ct. at 350) (emphasis added).

A litigant may perceive a "real or imaginary partiality" in a potential juror's manner of response during voir dire, body language, or appearance, all of which might, in the eyes of a seasoned trial lawyer, reveal bias or hostility. Blackstone teaches that a peremptory challenge may be based on the mere "sudden impressions and unaccountable prejudices we are apt to conceive upon the bare looks and gestures of another," and may be used to strike those "against whom he has conceived a prejudice, even without being able to assign a reason for such dislike." Blackstone, 4 *Commentaries* 353.

### B. Parameters of the right of peremptory challenge: procedural and substantive limitations

Despite the considerable freedom litigants have in exercising their right of peremptory challenge, the right is subject to procedures imposed by the trial court, and is circumscribed by an important substantive limitation: the anti-discrimination principle articulated by the Supreme Court in *Batson v. Kentucky* and cases following it.

#### 1. Procedural limitations on peremptory challenges

A trial court has considerable discretionary control over the administration of peremptory challenges. First, trial courts have considerable control over the scope of questioning permitted during voir dire. *Rosales–Lopez v. United States,* 451 U.S. 182, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981) (applying an abuse of discretion standard to the trial judge's decision whether to ask potential jurors about racial bias during voir dire). Second, trial courts exercise broad discretion in devising procedures by which parties exercise peremptory challenges. *See, for example,*

*ple, United States v. Williams,* 986 F.2d 86 (4th Cir.1993) (upholding "jury box" system of peremptory strikes), *cert. denied,* 509 U.S. 911, 113 S.Ct. 3013, 125 L.Ed.2d 703 (1993); *United States v. Blouin,* 666 F.2d 796 (2nd Cir.1981) (same). Finally, a trial court has considerable discretion in deciding whether to excuse a juror for cause, even where that decision necessitates that a litigant use a peremptory strike to remove a juror. *Ross v. Oklahoma,* 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988).

Although a trial court has considerable discretionary authority in administering peremptory strikes, a trial court commits reversible error if its procedures effect an impairment or an outright denial of a party's right of peremptory challenge. *See, for example, Aldridge v. United States,* 283 U.S. 308, 51 S.Ct. 470, 75 L.Ed. 1054 (1931) (reversal of criminal conviction required where trial court's restrictions on questions posed during voir dire unreasonably infringed on defendant's right to an impartial jury); *Ham v. South Carolina,* 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973) (reversible error where trial court refused to interrogate potential jurors as to possible racial prejudices); *United States v. Turner,* 558 F.2d 535 (9th Cir. 1977) (reversible error for trial court to use a system of peremptory challenges under which defendant unwittingly "waived" the right to such challenges).

#### 2. Substantive limitations on peremptory challenges

The seminal substantive limitation on the right of peremptory challenge emerged in *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). There, the Supreme Court announced an important limitation: peremptory challenges may not be used in a racially discriminatory manner.

In enacting this important limiting principle, the Court in *Batson* explicitly overruled a portion of *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). In *Swain,* the Court had allowed a prosecutor to use his peremptory challenges to remove all six black members of a jury panel in the criminal trial of a black defendant. The

Court acknowledged that the right of peremptory challenge is "frequently exercised on grounds normally thought irrelevant to legal proceedings or official action, namely, the race, religion, nationality, occupation or affiliations of people summoned for jury duty." *Swain,* 380 U.S. at 220, 85 S.Ct. at 836. Nonetheless, the Court refused to conclude that "the striking of Negroes in a particular case is a denial of equal protection of the laws." *Id.* at 221, 85 S.Ct. at 836. Although it suggested that "a State's *systematic* striking of Negroes in the selection of petit juries [might] raise[ ] a prima facie case under the Fourteenth Amendment," it concluded that the record of strikes in a single case was "not sufficient to demonstrate" a violation of equal protection. *Id.* at 224, 85 S.Ct. at 838 (emphasis added).

*Batson,* however, reached the opposite conclusion. It held that where a prosecutor bases peremptory challenges on race, even in just one case, those challenges constitute state action and violate the Fourteenth Amendment rights of both the prospective jurors and the criminal defendant. *Batson* therefore overruled only that portion of *Swain* defining the degree of proof needed to establish a violation of the Fourteenth Amendment right of equal protection.

Case law following *Batson* has delineated and refined the anti-discrimination limitation on the use of peremptory challenges. *See Holland v. Illinois,* 493 U.S. 474, 110 S.Ct. 803, 107 L.Ed.2d 905 (1990) (Caucasian defendant has standing to challenge discriminatory peremptory strikes against minority jury panel members); *Edmonson v. Leesville Concrete Co., Inc.,* 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991) (extending *Batson* principle to private litigants in civil actions); *Georgia v. McCollum,* 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992) (defendant's peremptory challenges subject to *Batson* principle); *J.E.B. v. Alabama,* 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994) (extending the anti-discrimination principle to peremptory strikes based on gender).

In the wake of *Batson,* some commentators have called for the abolition of peremptory challenges altogether because they believe that such challenges are based solely on stereotypes and therefore serve to discriminate against various groups. *See, for example,* Jason Hochberg, "Peremptory Challenge: An American Relic," 10 *Crim.Just.* 10 (1996); Christopher M. Ferdico, "The Death of the Peremptory Challenge: J.E.B. v. Alabama," 28 *Creighton L.Rev.* 1177 (1995); Susan A. Winchurch, Note, "J.E.B. v. Alabama ex rel T.B.: The Supreme Court Moves Closer to Elimination of the Peremptory Challenge," 54 *Md.L.Rev.* 261 (1995); Raymond J. Broderick, "Why the Peremptory Challenge Should be Abolished," 65 *Temple L.Rev.* 369 (1992); *see also Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) (Marshall, J., concurring).

The system of peremptory challenges has proved resilient, however, and remains a vital feature of the jury trial. Post-*Batson* decisions of the Supreme Court have reaffirmed the importance of peremptory challenges. In *Holland v. Illinois,* the Court explained:

We have acknowledged that that device [of peremptory challenge] occupies "an important position in our trial procedures," *Batson,* 476 U.S. at 98 [106 S.Ct. at 1724], and has indeed been considered "a necessary part of trial by jury," *Swain v. Alabama,* 380 U.S. at 219 [85 S.Ct. at 835]. Peremptory challenges, by enabling each side to exclude those jurors it believes will be most partial toward the other side, are a means of "eliminat[ing] extremes of partiality on both sides," *ibid.,* thereby "assuring the selection of a qualified *and unbiased* jury," *Batson,* 476 U.S. at 91, 106 S.Ct. at 1720. (emphasized in original)

493 U.S. at 484, 110 S.Ct. at 809.

Federal judges, moreover, appear sanguine about peremptory challenges. A recent survey of federal district court judges indicates that a majority of judges viewed peremptory challenges "as a mechanism for attorneys to remove potential jurors biased in favor of the opposition[.]" Christopher E. Smith & Roxanne Ochoa, "The Peremptory Challenge in the Eyes of the Trial Judge," 79 *Judicature* 185, 186 (January–February 1996). More than 85 per cent of judges surveyed responded affirmatively when asked whether peremptory challenges "make

a beneficial contribution to the attainment of fair trials and just outcomes[.]" *Id.*

## C. The traditional remedy for the deprivation of the right of peremptory challenge

Given the obvious importance of the right of peremptory challenge, a criminal defendant has long had a powerful remedy for the impairment or denial of this right: automatic reversal of the conviction. The Supreme Court has long maintained that "[t]he denial or impairment of the right is reversible error without a showing of prejudice." *Swain,* 380 U.S. at 219, 85 S.Ct. at 835 (citations omitted). The Court has applied this remedy for over one hundred years. *See Lewis,* 146 U.S. 370, 376, 13 S.Ct. 136, 138, 36 L.Ed. 1011 (1892) (trial court's deprivation of defendant's peremptory challenges is reversible error); *Harrison v. United States,* 163 U.S. 140, 142, 16 S.Ct. 961, 961, 41 L.Ed. 104 (1896) (same); *Gulf, Colorado & Santa Fe Ry. Co. v. Shane,* 157 U.S. 348, 351, 15 S.Ct. 641, 642, 39 L.Ed. 727 (1895) (reversing adverse jury verdict where civil defendant deprived of right of peremptory challenge).

This Circuit has long followed this remedial principle. In *United States v. Turner,* we held that "[a]n error in restricting the exercise of peremptory challenges results in an automatic reversal. The defendant need not show that he was prejudiced by the error." *United States v. Turner,* 558 F.2d 535, 538 (9th Cir.1977). In *Turner,* the district court restricted a criminal defendant's exercise of peremptory challenges by treating his attorney's unwitting failure to challenge a codefendant's jury panel as a waiver of Turner's right of peremptory challenge. Turner was thereafter convicted of a series of offenses growing out of his assault on a fellow federal prisoner. On appeal, we concluded that the effect of the district court's procedure was to deprive Turner of all of his peremptory challenges. For that reason, we reversed his conviction. *See also Medrano v. City of Los Angeles,* 973 F.2d 1499, 1503 (9th Cir.1992) (reversible error where trial court erroneously denied peremptory challenge to alternate juror who ultimately replaced member of jury and rendered verdict), *cert. denied,* 508 U.S. 940, 113 S.Ct. 2415, 124 L.Ed.2d 638 (1993); *United States v. Brooklier,* 685 F.2d 1208, 1223 (9th Cir.1982) ("The defendant need not show actual prejudice. Any error which impairs the exercise of peremptory challenges is reversible error.") (citing *Swain* and *Turner*), *cert. denied,* 459 U.S. 1206, 103 S.Ct. 1194, 1195, 75 L.Ed.2d 439 (1983); *United States v. Allsup,* 566 F.2d 68, 71 (9th Cir.1977) (same).

Moreover, every other circuit to address this issue agrees that the erroneous deprivation of a defendant's right of peremptory challenge requires automatic reversal. *See United States v. Broussard,* 987 F.2d 215, 221 (5th Cir.1993) ("The denial or impairment of the right to exercise peremptory challenges is reversible error without a showing of prejudice."), *abrogated on other grounds by J.E.B. v. Alabama,* 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994); *Olympia Hotels Corp. v. Johnson Wax Dev. Corp.,* 908 F.2d 1363, 1369 (7th Cir.1990) ("It is reversible error to deny a party to a jury trial the peremptory challenges to which the rules of procedure entitle him. . . ."); *United States v. Ruuska,* 883 F.2d 262, 268 (3rd Cir.1989) (affirming the automatic reversal rule described in *Swain,* and stating that *Batson* "does not call into question this aspect of *Swain.*"); *United States v. Ricks,* 802 F.2d 731, 734 (4th Cir.) (en banc), *cert. denied,* 479 U.S. 1009, 107 S.Ct. 650, 93 L.Ed.2d 705 (1986) (same); *Carr v. Watts,* 597 F.2d 830, 832 (2nd Cir.1979) (impairment of right of peremptory challenge is "reversible error without a showing of prejudice"). Other circuits have recognized the automatic reversal rule in dicta. *See United States v. Cambara,* 902 F.2d 144, 147 (1st Cir.1990) ("restricting a defendant's use of the lawful number of peremptory challenges is reversible error if a challenge for cause is erroneously denied"); *United States v. Mosely,* 810 F.2d 93, 96 (6th Cir.), *cert. denied,* 484 U.S. 841, 108 S.Ct. 129, 98 L.Ed.2d 87 (1987) (same).

With this understanding of peremptory challenges in mind, we turn next to the proper remedy to be applied once an erroneous

deprivation of the right of peremptory challenge is found.

## II. The appropriateness of the traditional remedy in light of recent developments in criminal procedure

The government relies upon two divergent strains of case law to overcome the longstanding remedy of automatic reversal: (1) the emergence of the anti-discrimination principle in *Batson* and its progeny and (2) the evolution of harmless-error analysis. We now consider these disparate legal developments and whether either of these changes supports a harmless-error rule announced by the panel.

### A. *Batson* and the rule of automatic reversal

The government's first argument—that *Batson* and subsequent cases have effectively eroded the right of peremptory challenge—is misplaced. First, *Batson* and its progeny merely limited the right of peremptory challenge; the Supreme Court has never announced an intention to abolish it. Although the cases prohibit peremptory challenges that effect discrimination on the basis of race or gender, the anti-discrimination principle they articulated is not a wholesale rejection of the peremptory challenge as an important tool in jury selection. As discussed above, the peremptory challenge serves a broader purpose: to enable litigants to strike jurors who appear biased in some other respect, or those who exhibit hostility toward a particular litigant or attorney. The broader rationale for peremptory challenges thus survives the *Batson* line of decisions. Indeed, post-*Batson* decisions by the Supreme Court confirm the continuing viability and importance of peremptory challenges as a means of achieving an impartial jury. In *Holland,* for example, the Court noted that "the system of peremptory challenges has traditionally provided" an "assurance of impartiality." *Holland,* 493 U.S. at 483, 110 S.Ct. at 809. Second, our review of the reasoning of *Batson* and later cases convinces us that these cases in no way undermine the justifications for the right of peremptory challenge. The equal protection rationale of *Batson* and later cases simply has no bearing on peremptory challenges that are not based on invidious group discrimination.

The government's second concern—that a rule of automatic reversal punishes district courts that are overzealous in enforcing the anti-discrimination principle of *Batson* and its progeny—is also unfounded. It is true that trial courts bear a heavy burden in enforcing *Batson*'s anti-discrimination principle, given that the erroneous denial of a party's peremptory challenge has traditionally warranted automatic reversal. However, this concern was alleviated by a recent Supreme Court decision offering guidance to trial courts faced with deciding whether a particular peremptory challenge has a discriminatory motive. In *Purkett v. Elem,* the Court clarified the burden imposed on the party proposing a peremptory challenge. Once the opponent of a peremptory challenge has made out a prima facie case of racial discrimination pursuant to *Batson,* the burden shifts to the proponent of the strike "to come forward with a race-neutral explanation." *Purkett,* —— U.S. at ——, 115 S.Ct. at 1770. The standard announced by the Supreme Court in *Purkett* is a forgiving one: the proponent's burden of production "does not demand an explanation that is persuasive, or even plausible. 'At this step of the inquiry, the issue is the facial validity of the [ ] explanation. Unless a discriminatory intent is inherent in the [ ] explanation, the reason offered will be deemed race neutral.'" *Purkett,* —— U.S. at ——, 115 S.Ct. at 1771 (citing *Hernandez v. New York,* 500 U.S. 352, 360, 111 S.Ct. 1859, 1866–67, 114 L.Ed.2d 395 (1991)).

Given *Purkett*'s lenient standard, which leaves vast room for discretion on the part of trial courts ruling on *Batson* objections, the government's second concern is misplaced. *Purkett* clarifies the distinction between proper peremptory challenges and improper, race- or gender-based challenges. The threat of reversal therefore need not hamstring the trial courts in allowing peremptory challenges.

Finally, we address what is perhaps the central consideration in deciding whether *Batson* and its progeny justify supplanting

our traditional automatic reversal rule: whether and how the *Batson* line of cases bear on the remedy for the erroneous deprivation of a right of peremptory challenge. At the very heart of this case is this question: what is the proper remedy for the deprivation of a right of peremptory challenge? Significantly, *Batson* never addressed this issue. For that reason, *Batson* left intact that portion of *Swain* that set forth the remedial rule for such errors: "The denial or impairment of the right [of peremptory challenge] is reversible error without a showing of prejudice." *Swain,* 380 U.S. at 218, 85 S.Ct. at 835 (citations omitted). Any other conclusion simply misapprehends the analysis in *Batson.*

Given the foregoing analysis, we conclude that *Batson* and subsequent cases do not support the adoption of a harmless-error standard for the erroneous deprivation of the right of peremptory challenge. These cases neither eliminate the right of peremptory challenge nor weaken its remedy of automatic reversal.

**B. Applicability of harmless-error analysis to the erroneous denial of the right of peremptory challenge**

We turn next to the government's second suggested rationale for substituting a harmless-error analysis for the longstanding rule of automatic reversal. The government contends that apart from cases where the evidence does not justify conviction beyond a reasonable doubt, "the only cases where reversal is mandatory are those in which structural error occurred[.]" Response to Petition for Rehearing at 3, citing *Annigoni,* 68 F.3d at 284 (*citing Brecht v. Abrahamson,* 507 U.S. 619, 628–30, 113 S.Ct. 1710, 1717, 123 L.Ed.2d 353 (1993)). The government also relies on the Supreme Court's decision in *Ross v. Oklahoma,* which applied a harmless-error analysis to a trial court's erroneous denial of a challenge for cause, an error the defendant claimed forced him to waste a peremptory challenge. Although neither of these decisions require a departure from the rule of automatic reversal, the government argues, based on these sources, that the erroneous denial of peremptory challenge is subject to harmless-error analysis. We strongly disagree.

### 1. Harmless-error analysis

Under harmless-error analysis, an appellate court, upon finding that either a constitutional or non-constitutional error occurred in the trial court, may nonetheless affirm a conviction on the ground that the error was harmless. Federal Rule of Criminal Procedure 52(a) provides that "any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." The purpose of harmless-error analysis is to avoid "setting aside convictions for small errors or defects that have *little, if any, likelihood of having changed the result of the trial,*" because reversal would entail substantial social costs. *Chapman v. California,* 386 U.S. 18, 22, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967) (emphasis added).

In determining whether an error is subject to harmless-error analysis, a reviewing court must determine whether the error is a "classic 'trial error,'" such as the improper admission of evidence. *Arizona v. Fulminante,* 499 U.S. 279, 309, 111 S.Ct. 1246, 1264, 113 L.Ed.2d 302 (1991). In *Fulminante,* the Supreme Court defined "trial error" as "error which occurred during the presentation of the case to the jury, and *which may therefore be quantitatively assessed in the context of other evidence presented* in order to determine whether its admission was harmless beyond a reasonable doubt." *Fulminante,* 499 U.S. at 307–08, 111 S.Ct. at 1264 (emphasis added). "Structural" errors, in contrast, are "defects in the constitution of the trial mechanism, which *defy analysis by 'harmless-error' standards* [,]" *id.* at 309, 111 S.Ct. at 1265 (emphasis added), and affect "the framework within which the trial proceeds, *rather than simply an error in the trial process itself.*" *Id.* at 310, 111 S.Ct. at 1265.

Some commentators have treated harmless-error jurisprudence as establishing a strict dichotomy between trial error, which is subject to harmless-error analysis, and structural error, which is per se reversible. *See* "Twenty–Fourth Annual Review of Criminal Procedure," 83 *Georgetown L.J.* 665, 1365

(March–April 1995). The case law does not appear to establish such a rigid dichotomy, however. In its recent *Brecht* decision, the Supreme Court characterized the divergence between trial and structural errors as a "*spectrum* of constitutional errors" rather than a rigid dichotomy. *Brecht*, 507 U.S. at 629, 113 S.Ct. at 1717 (emphasis added). *See also Fulminante*, 499 U.S. at 290–91, 111 S.Ct. at 1254–55 (White, J., dissenting) ("our jurisprudence on harmless error has not classified so neatly the errors at issue" so as to establish a "meaningless dichotomy between 'trial errors' and 'structural defects.'"). Moreover, numerous errors are subject to automatic reversal even though they do not violate constitutional rights, *Gomez v. United States*, 490 U.S. 858, 874–76, 109 S.Ct. 2237, 2248, 104 L.Ed.2d 923 (1989) (reversible error for magistrate to supervise voir dire during felony trial in violation of Federal Magistrate's Act, which violated defendant's statutory right "to have all critical stages of a criminal trial conducted by a person with jurisdiction to preside."), or fit the definition of structural error. *United States v. Pelletier*, 898 F.2d 297, 303 (2nd Cir.1990) (deliberate use at trial of defendant's immunized grand jury testimony cannot be considered harmless error). Although we conclude that the erroneous denial of the right of peremptory challenge is not amenable to harmless-error analysis, we need not decide whether such error rises to the level of structural error.

The error in this case—the erroneous denial of a right of peremptory challenge—is simply not amenable to harmless-error analysis. First, unlike typical trial errors, this error did not "occur[ ] during the presentation of the case to the jury[.]" *Fulminante*, 499 U.S. at 307, 111 S.Ct. at 1264. Instead, the initial denial of the challenge occurred before the presentation of the case, but the resulting presence of Juror Hom was an ongoing feature of the trial.

Second, this error, unlike the error in *Fulminante*, may *not* be "*quantitatively assessed in the context of other evidence pre-*

sented in order to determine whether its admission was harmless beyond a reasonable doubt." *Id.* at 308, 111 S.Ct. at 1264. (emphasis added). In *Fulminante*, the Court held that the admission of a defendant's coerced confession was subject to harmless-error analysis. *Fulminante*, 499 U.S. at 295, 111 S.Ct. at 1257. In its harmless-error analysis, the Court looked at the erroneously admitted evidence and compared it to other evidence the government had mustered against the defendant. It was able to evaluate the impact of the error because it was able to weigh the coerced confession relative to other known and tangible evidence. It also had an entire trial record as a frame of reference against which to compare the erroneously admitted confession. Given all of the information it had, and given its institutional ability to weigh such evidence, the Court in *Fulminante* had a rational basis on which to assess the particular harm and to conclude that the erroneous admission of the coerced confession was not harmless.

Unlike errors the Supreme Court has subjected to harmless-error analysis, it would be virtually impossible to determine whether the denial of a peremptory challenge was harmless enough to warrant affirming the conviction. For several reasons, the denial of a defendant's right of peremptory challenge eludes a determination of whether a judgment was or was not "substantially swayed by the error."[9]

To apply a harmless-error analysis in this context would be to misapprehend the very nature of peremptory challenges. The peremptory challenge is used precisely when there is no identifiable basis on which to challenge a particular juror for cause. By its very nature, the peremptory challenge is a tool that may be wielded in a highly subjective and seemingly arbitrary fashion, based upon mere impressions and hunches. Although a litigant may suspect that a potential juror harbors an unarticulated bias or hostility, that litigant would be unable to demonstrate that bias or hostility to an appellate

9. Where, as here, the error was not constitutional, the Supreme Court requires that to uphold a conviction, federal appellate courts applying harmless-error analysis must determine with

"fair assurance ... that the *judgment was not substantially swayed* by the error." *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946)(emphasis added).

court reviewing for harmless error. Similarly, the government would be hard-pressed to bear its burden of proving that the seating of a peremptorily challenged juror did not harm the defendant. *United States v. Olano,* 507 U.S. 725, 734, 113 S.Ct. 1770, 1777–78, 123 L.Ed.2d 508 (1993) (under harmless error review, government bears the burden of persuasion with respect to prejudice). It would be difficult if not impossible for a reviewing court to determine the degree of harm resulting from erroneously allowing a juror to sit despite an attempted peremptory challenge.

Another obstacle to harmless-error review of an erroneous denial of peremptory challenge is the dearth of information concerning what went on in the jury room. To subject the denial of a peremptory challenge to harmless-error analysis would require appellate courts to do the impossible: to reconstruct what went on in jury deliberations through nothing more than post-trial hearings and sheer speculation. In the context of an appeal based on denial of a peremptory challenge, there is inadequate evidence for an appellate court to determine the degree of harm resulting from the seating of a juror despite a defendant's attempted peremptory strike. *See also United States v. Noushfar,* 78 F.3d 1442, 1445–46 (9th Cir.1996) (holding that it was structural error for district court to allow jury to listen to audio tapes that had not been played during the trial, and emphasizing that reviewing court "cannot assess the impact" on the jury's deliberations); *Guam v. Marquez,* 963 F.2d 1311, 1316 (9th Cir.1992) (holding that it was structural error for trial court to give written instructions to jury in lieu of reading them in open court, and explaining that the error "prevents an appellate court from conducting a harmless error analysis because the record is silent regarding whether any of the jurors read the instructions," making it "impossible to determine if [the] error was prejudicial.").

The facts of this case illustrate the practical problems with applying a harmless-error analysis to a trial court's erroneous denial of a peremptory challenge. The transcript of voir dire contains very little detail about Juror Hom and the extent of any biases he might have had against, for example, limited partnerships, real estate brokers, or Annigoni himself. On this typically sparse record, there is simply no way to tell whether the seating of Juror Hom was harmless, or highly prejudicial, much less any way to ascertain Juror Hom's impact, if any, on the jury's verdict against Annigoni.

■ Under harmless-error review, it is the government that "bears the burden of persuasion with respect to prejudice." *Olano,* 507 U.S. at 734, 113 S.Ct. at 1778. It is far from certain that this error was harmless here. Juror Hom took his place on the jury, over appellant's wishes, because the district court erroneously refused to allow appellant to exercise a peremptory strike against him. To apply a harmless-error analysis omits an important consideration: the potential harm of having Juror Hom sit in judgment of the appellant. In this case, Annigoni's attorney sought to excuse potential juror Jue Hom because she was concerned that his investments in Merrill Lynch limited partnerships and his possible involvement in litigation concerning those investments suggested he would be more inclined to convict Annigoni for his involvement in an allegedly fraudulent limited partnership. Such concerns appear well-founded. In recent years, numerous investors have filed class-action lawsuits over sales of risky limited partnerships, and Merrill Lynch is one of several major brokerage houses defending such suits.[10] That Juror Hom was not challengeable for cause is irrelevant, since the harm alleged was denial of a peremptory strike, not denial of a challenge for cause. Based on Juror Hom's investment experience, one could plausibly infer that he might bear hostility toward purveyors of lim-

---

10. Recent news reports note that Merrill Lynch & Co. is one of several brokerage houses negotiating settlements with the Securities and Exchange Commission concerning potential charges that during the 1980s, the firms' brokers misled investors about the risk involved in limited-partnership investments. Settlements report-

edly could total as much as $100 million. *See* Ann Bancroft, "California investors take on brokerage," in *The Orange County Register,* February 14, 1996; Michael Siconolfi, "U.S. regulators, brokers study pact to settle partnership claims," in *The Asian Wall Street Journal,* January 29, 1996.

ited partnerships who undertake fraudulent transactions. The attempted application of harmless-error analysis in this case demonstrates the futility of evaluating the harm that flows from the denial of a defendant's right of peremptory challenge.

### 2. The harmless-error rule of *Ross v. Oklahoma*

The final legal authority on which the government relies in seeking a new remedy for erroneous deprivations of peremptory challenges is *Ross v. Oklahoma,* 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988). In *Ross,* a state trial court erroneously denied a defendant's challenge for cause. To counteract this error, the defendant used a peremptory challenge to strike the challenged juror. Although Ross argued that the trial court's error violated his Sixth and Fourteenth Amendment right to an impartial jury and his Fourteenth Amendment right to due process by requiring him to use a peremptory challenge he otherwise would not have needed to use, the Supreme Court did not reverse Ross's conviction. It reasoned, first, that the right of peremptory challenge is not constitutional, *Ross,* 487 U.S. at 88, 108 S.Ct. at 2278, and, second, that Ross received and used all the peremptory challenges to which Oklahoma law entitled him, concluding that "the 'right' to peremptory challenges is 'denied or impaired' only if the defendant does not receive that which state law provides." *Id.* at 89, 108 S.Ct. at 2279. Unlike Annigoni, Ross *did* receive the peremptories to which he was entitled under state law, and exercised them to remove the suspicious juror. As a consequence, the offending juror did not sit on the jury that convicted him. *Ross,* 487 at 85–86, 108 S.Ct. at 2276–77.

Because *Ross* did not involve the erroneous denial of a peremptory challenge, its holding does not support the conclusion that the error in this case—the outright denial of a peremptory challenge—warrants mere harmless-error review. The government unfortunately offers little analysis of how *Ross* supports the adoption of a harmless error remedy. Instead, it mischaracterizes *Ross* as having involved the loss of a peremptory challenge, then suggests that because the

verdict against Ross was not reversed, Annigoni's conviction should also stand. The government's reading of *Ross,* however, ignores key differences between *Ross* and this case, differences which warrant different remedies.

The Court in *Ross* did not outright block the defendant's peremptory challenge on the basis of a *Batson* objection, as did the district court in this case. Rather, the court's erroneous denial of Ross's challenge for cause prompted Ross to expend one of his peremptory challenges to remove the questionable juror; it *never deprived him* of the right of peremptory challenge. Even more significantly, the juror in *Ross* never sat on the jury that convicted Ross. The case therefore does not present the problem posed by harmless-error analysis in this case: the impossibility of ascertaining Juror Hom's impact on the outcome.

These two distinctions suggest that reliance on *Ross* is misplaced. This conclusion is bolstered not only by the reasoning of *Ross* itself, but also by decisions subsequent to *Ross* wherein courts continue to reverse convictions where trial courts have impaired a litigant's right of peremptory challenge.

First, the Supreme Court in *Ross* distinguished the outright *denial* of a peremptory challenge from the forced *use* of a peremptory challenge. The *Ross* court itself acknowledged that "the right to exercise peremptory challenges is 'one of the most important of the rights secured to the accused,'" *Ross,* 487 U.S. at 89, 108 S.Ct. at 2278, citing *Swain,* 380 U.S. at 219, 85 S.Ct. at 835, and acknowledged the rule in *Swain* that "'[t]he denial or impairment of the right is reversible error without a showing of prejudice.'" *Ross,* 487 U.S. at 89, 108 S.Ct. at 2279, citing *Swain,* 380 U.S. at 219, 85 S.Ct. at 835. Without questioning the automatic reversal rule, the Court in *Ross* first rejected Ross's due process claim because it noted that peremptory challenges are guaranteed by statute, not by the Constitution. *Ross,* 487 U.S. at 89, 108 S.Ct. at 2278–79. Second, the Court explained that in state cases, state law governs the number, purpose, and manner of peremptory challenges. Noting that Ross was not deprived of his state-law protections,

the Court concluded that there had been no violation of the state-law right of peremptory challenge. *Id.* Annigoni, in contrast, was wrongly denied his right of peremptory strike against Juror Hom.

More recently, other circuits have distinguished the application of harmless error in *Ross* from the outright denial of peremptory challenges. *See Kirk v. Raymark Industries, Inc.,* 61 F.3d 147 (3rd Cir.1995) (holding that the denial or impairment of a statutory right of peremptory challenge is per se reversible without proof of prejudice, and distinguishing the claim in *Ross* as constitutionally based), *cert. denied,* —— U.S. ——, 116 S.Ct. 1015, 134 L.Ed.2d 95 (1996); *United States v. Broussard,* 987 F.2d 215, 221 (5th Cir.1993) (holding that the denial of right of peremptory challenge is reversible error even after *Ross,* and explaining that applying harmless-error review to the erroneous denial of a peremptory challenge "would eviscerate the right to exercise peremptory challenges, because it would be virtually impossible to determine that [the denial], injurious to the perceived fairness of the petit jury [was] harmless."), *abrogated on other grounds by J.E.B. v. Alabama,* 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994). These decisions demonstrate the continued viability of the automatic reversal rule after *Ross.*

**3. The distinction between the misuse of a peremptory challenge and the denial of a peremptory challenge**

Finally, we consider the distinction the government would have us draw between the erroneous *use* of a peremptory challenge and the erroneous *denial* of its use. Clearly, the proper remedy for the improper use of a peremptory challenge is automatic reversal. But this does not mean it would be appropriate to subject the *denial* of a peremptory challenge to mere harmless-error review. If the former were reversible error but the latter were subject to harmless-error review, a district court would have every incentive to err on the side of denying peremptory challenges. Such a disparity in remedies would seriously impair the full use of peremptory challenges, because it would encourage a dis-

trict court to deny peremptory challenges in close cases.

**CONCLUSION**

For the reasons discussed above, we hold that the denial of a peremptory challenge was erroneous, and the error requires reversal of the conviction.

REVERSED and REMANDED.

LEAVY, Circuit Judge, with whom KOZINSKI and KLEINFELD, Circuit Judges, join, dissenting:

I respectfully dissent. The majority holds that a trial judge's refusal to participate in what he thinks is a racially motivated exclusion of a qualified juror requires automatic reversal. The majority reaches this conclusion by focusing on the virtue of the peremptory challenge while losing sight of the significance of those cases decided since *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). It characterizes *Holland v. Illinois,* 493 U.S. 474, 110 S.Ct. 803, 107 L.Ed.2d 905 (1990); *Edmonson v. Leesville Concrete Co.,* 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991); *Georgia v. McCollum,* 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992); and *J.E.B. v. Alabama,* 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994), as having "delineated and refined the anti-discrimination limitation on the use of peremptory challenges." Majority opinion at 1140. Whether we think the result in *McCollum* is "remarkable," as Justice O'Connor said at 505 U.S. 62, at 112 S.Ct. 2360–61, or "terminally absurd," as observed by Justice Scalia at 505 U.S. 69, at 112 S.Ct. 2364, it, along with the other cases cited, represents a "sea change," not so much for the anti-discrimination goals but for the peremptory challenge itself. To achieve the long-standing goal of preventing state-sanctioned discrimination, the peremptory challenge has in certain circumstances become something other than peremptory.

The purpose of a peremptory challenge is to permit the litigant to participate with the court in the selection of a fair and impartial jury. *McCollum,* 505 U.S. at 57, 112 S.Ct. at 2357; *Edmonson,* 500 U.S. at 630, 111 S.Ct.

at 2088. Yet, it has always been something of an arbitrary act. In the last ten years, however, the Supreme Court has transformed the peremptory challenge from an arbitrary act of an individual into an exercise of governmental power.

*Batson* by its terms only changed the evidentiary formulation for assessing a prima facie case of discrimination under the Equal Protection Clause. *Edmonson* transformed a private attorney representing a civil litigant into a state actor when exercising a peremptory challenge. The Court observed:

> By their very nature, peremptory challenges have no significance outside a court of law. Their sole purpose is to permit litigants to assist the government in the selection of an impartial trier of fact. While we have recognized the value of peremptory challenges in this regard, particularly in the criminal context, *see Batson*, 476 U.S., at 98–99 [106 S.Ct., at 1724–25], there is no constitutional obligation to allow them. *Ross v. Oklahoma*, 487 U.S. 81, 88, 108 S.Ct. 2273 [2278], 101 L.Ed.2d 80 (1988); *Stilson v. United States*, 250 U.S. 583, 586, 40 S.Ct. 28 [29–30], 63 L.Ed. 1154 (1919). Peremptory challenges are permitted only when the government, by statute or decisional law, deems it appropriate to allow parties to exclude a given number of persons who otherwise would satisfy the requirements for service on the petit jury.

*Edmonson*, 500 U.S. at 620, 111 S.Ct. at 2083.

In *McCollum*, the Court held that the Constitution prohibits a criminal defendant from engaging in purposeful racial discrimination in the exercise of peremptory challenges. As Justice O'Connor observed when the Court extended *Batson* and its progeny to gender, "today's decision further erodes the role of the peremptory challenge ... we have added an additional burden to the state and federal trial process, taken a step closer to eliminating the peremptory challenge...." *J.E.B. v. Alabama*, 511 U.S. at —— ——, 114 S.Ct. at 1431–32 (O'Connor, J., concurring).

Thus, whether Mr. Annigoni likes it or not, he was a state actor when he attempted to challenge Mr. Hom. He was free to act with no reason, or for implausible or fantastic or even superstitious reasons, so long as he was not motivated by race or gender. The government also took state action when it opposed the challenge to Mr. Hom, and even had the right to assert Mr. Hom's constitutional right to be free from race discrimination. In ruling on the challenge, the court was required to subject the challenge to scrutiny, because the erroneous grant of a racially or gender motivated peremptory challenge is per se reversible. The majority, in keeping with pre-*Batson* cases, now holds that the erroneous *denial* of a peremptory challenge, even when the denial is an effort to avoid unconstitutional race discrimination, is also per se reversible.

Except for Justice Marshall's advocacy of the abolition of peremptory challenges in his concurrence in *Batson*, 476 U.S. at 103, 106 S.Ct. at 1726–27 (Marshall, J., concurring), the Justices of the Supreme Court have repeatedly expressed their belief that the peremptory challenge serves a salutary function. Yet, in spite of its recognition of the value of the peremptory challenge, the Court has drastically changed the nature of the peremptory challenge by subjecting it to scrutiny in the case of challenges opposed on the basis of asserted gender bias or alleged racial bias. Because the peremptory challenge has changed, our review of the trial court's scrutiny of its exercise must change, too.

In my view, to subject every trial court allowance or disallowance of a peremptory challenge to automatic reversal places the trial judge in an untenable position and endangers the continued existence of the statutory right. The erroneous disallowance of a peremptory challenge only deprives a party of a statutory right, and should be reviewed for harmless error.

"[I]t is important to recall that peremptory challenges are not constitutionally protected fundamental rights; rather, they are but one state-created means to the constitutional end of an impartial jury and a fair trial." *McCollum*, 505 U.S. at 57, 112 S.Ct. at 2358. Thus, "peremptory challenges are a creature of statute and are not required by the Constitution...." *Ross v. Oklahoma*, 487 U.S. 81,

89, 108 S.Ct. 2273, 2279, 101 L.Ed.2d 80 (1988). Congress may regulate the number of peremptory challenges available, *Stilson v. United States,* 250 U.S. 583, 586, 40 S.Ct. 28, 29–30, 63 L.Ed. 1154 (1919), and states may impose additional restrictions on peremptory challenges which "subordinate[ ] the absolute freedom to use a peremptory challenge as one wishes to the goal of empaneling an impartial jury. Indeed, the concept of a peremptory challenge as a totally free-wheeling right unconstrained by any procedural requirement is difficult to imagine." *Ross,* 487 U.S. at 90, 108 S.Ct. at 2279.

As noted, *McCollum* established that a criminal defendant exercising a peremptory challenge is performing a governmental function, and that his statutory rights must give way to the constitution's prohibition on discrimination. 505 U.S. at 55–57, 112 S.Ct. at 2357–58. Because the criminal defendant's peremptory challenge is now a governmental power, exercised under the control of the trial courts, trial courts have the difficult task of reviewing peremptories for unconstitutional motives and at the same time allowing the parties to exercise their statutory "right" to challenge potential jurors. Contrary to the majority's assertion, *Purkett v. Elem,* —— U.S. ——, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995), did not make this task any easier. *Purkett* reduced the burden on the proponent of the peremptory challenge, not on the trial court. Under *Purkett,* "once the opponent of a peremptory challenge has made out a prima facie case of racial discrimination (step 1), the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step 2). *If a race-neutral explanation is tendered, the trial court must then decide (step 3) whether the opponent of the strike has proved purposeful racial discrimination.*" *Id.* at ——–——, 115 S.Ct. at 1770–71 (emphasis added). While the explanation offered by the proponent need not be "persuasive, or even plausible," *id.* at ——, 115 S.Ct. at 1771, the trial court must still make a determination "whether the opponent of the strike has carried his burden of proving purposeful discrimination." *Id.* (citing *Batson* ). The trial court should have "substantial latitude" in making this determination, and not face auto-

matic reversal for errors made in good faith. *Cf. Wheat v. United States,* 486 U.S. 153, 163, 108 S.Ct. 1692, 1699, 100 L.Ed.2d 140 (1988) (trial court should have substantial latitude in applying new rule concerning disqualification of counsel representing defendants jointly charged).

Moreover, in the last ten years the Supreme Court has established that even errors that violate important *constitutional* rights are subject to harmless error analysis. Structural errors "are the exception and not the rule." *Rose v. Clark,* 478 U.S. 570, 578, 106 S.Ct. 3101, 3106, 92 L.Ed.2d 460 (1986). "Accordingly, if the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other errors that may have occurred are subject to harmless-error analysis." *Id.* at 579, 106 S.Ct. at 3106. Applying this presumption, the Supreme Court has held that: violations of the right to remain silent before and during trial, *Brecht v. Abrahamson,* 507 U.S. 619, 628–30, 113 S.Ct. 1710, 1716–18, 123 L.Ed.2d 353 (1993); violations of the due process right to have the prosecution prove every element of the crime, *Yates v. Evatt,* 500 U.S. 391, 402, 111 S.Ct. 1884, 1892, 114 L.Ed.2d 432 (1991); and the admission of a coerced confession which fully implicated the defendant in the charged crime, *Arizona v. Fulminante,* 499 U.S. 279, 310, 111 S.Ct. 1246, 1265, 113 L.Ed.2d 302 (1991), are all subject to harmless error review. Most recently, we said we were following the teaching of the Supreme Court when we reviewed for harmless error the denial of a defendant's constitutional right of confrontation in a case in which the trial court received a verdict imposing the death penalty in the absence of the defendant. *Rice v. Wood,* 77 F.3d 1138 (9th Cir.1996) (en banc). We have gone from that holding to the majority's holding that the denial of a defendant's statutory right to exercise a peremptory challenge, which he has an unfettered right to exercise even for reasons of superstition, now calls for automatic reversal. John Quincy Adams said it best: "I told him that I thought it was law logic—an artificial system of reasoning, ex-

clusively used in Courts of justice, but good for nothing anywhere else." [1]

I would affirm Annigoni's conviction, based on the unanimous verdict of twelve impartial jurors in this case of clear guilt.

KOZINSKI, Circuit Judge, dissenting.

I agree with much in Judge Hawkins's opinion and wish very much I could join it. In particular, I could not have expressed more clearly or eloquently the value of the peremptory challenge as a tool for ensuring not only that jurors be impartial, but that they appear so to the parties whose fates and fortunes they determine. I join Judge Leavy's dissent because it reflects more accurately the Supreme Court's teaching, and because I fear that the majority's ruling will undermine the viability of peremptory challenges. I elaborate briefly on these points.

1. What makes this case difficult for me is that the error is not amenable to normal harmless error analysis, as we can never figure out what would have happened if one member of the jury had been struck and replaced by some other, unknown, person. Thus, we are forced to choose from two all-or-nothing rules: the error is *always* harmless or it is *never* harmless. There is no practical middle ground.

Given this choice, I believe the Supreme Court would conclude that this kind of error is always harmless. The right to a certain number of peremptory strikes-or to any at all-is not guaranteed by the Constitution; it's not embodied in the concept of due process. *See Georgia v. McCollum,* 505 U.S. 42, 57, 112 S.Ct. 2348, 2357–58, 120 L.Ed.2d 33 (1992). Since the Court has allowed for the possibility of harmless error even when important constitutional rights are violated, *see* ante at 1149 (Leavy, J., dissenting), I find it hard to believe the Court would now conclude that it's always reversible error to deny a defendant a mere statutory right.

In *Ross v. Oklahoma,* 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988), the Court traveled too far in the other direction. Ross was forced to use a peremptory on a juror who should have been stricken for cause.

It's not accurate to say, as does the majority, that "[t]he court in *Ross* ... *never deprived* [defendant] of the right of peremptory challenge." Maj. op. at 1146. In fact, Ross was entitled to nine not-for-cause strikes but got only eight; he wasted one peremptory undoing the trial court's error. 487 U.S. at 84, 108 S.Ct. at 2276. This was the fulcrum of Justice Marshall's dissent: "In this case, everyone concedes that the trial judge could not arbitrarily take away one of the defendant's peremptory challenges. Yet, that is in effect exactly what happened here." *Id.* at 91, 108 S.Ct. at 2280 (Marshall, J., dissenting). By our majority's logic, this should have resulted in automatic reversal, but did not. In language that speaks to our case, the *Ross* majority answered Justice Marshall: "[W]e reject the notion that the loss of a peremptory challenge constitutes a violation of the constitutional right to an impartial jury." *Id.* at 88, 108 S.Ct. at 2278. Annigoni, like Ross, didn't get to use a challenge to which he was entitled. But "[s]o long as the jury that sits is impartial," *id.,* the defendant suffers no reversible error.

2. I also fear that the majority's ruling will make peremptory strikes too dear a luxury. *Batson* challenges have become commonplace in our courtrooms; rare is the trial where one side or the other does not rattle a *Batson* sabre. Today's opinion turns every erroneous ruling-either wrongfully sustaining or wrongfully rejecting a *Batson* challenge-into sudden death. Retrials are expensive, especially where the prosecutor, the defense lawyer and the judge are all on the government's payroll. A rule that turns every peremptory challenge error into a retrial gives a strong incentive to federal and state legislators to cut down the number of peremptories-or eliminate them altogether.

Unlike the majority, I do not take much comfort from *Purkett v. Elem,* —— U.S. ——, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995), because I do not read *Purkett* as reducing *Batson* to a formality. Under *Purkett,* trial courts must still decide whether a proffered explanation is a subterfuge, and this can be a basis for appeal and reversal. We do not

---

**1.** John Quincy Adams, *Memoirs of John Quincy*     *Adams* 4:372 (Charles Francis Adams ed. 1875).

help the noble cause of peremptory challenges by making every error in this delicate process fatal.