# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### On Brief February 2, 2010

## STATE OF TENNESSEE v. ERIC CATHEY

### Appeal from the Criminal Court for Shelby County
### No. 06-06-09485    John P. Colton, Jr., Judge

---

### No. W2008-01446-CCA-R3-CD   -   Filed July 20, 2010

---

In December 2006, the Shelby County Grand Jury indicted Appellant, Eric Cathey, for one count of felony first degree murder, one count of aggravated child abuse, and one count of aggravated child neglect. These charges were the result of the death of Appellant's two-month-old daughter. At the conclusion of a jury trial, the jury found Appellant guilty of all three counts. The trial court held a sentencing hearing and merged the aggravated child neglect conviction into the aggravated child abuse conviction. The trial court imposed a sentence of life with parole for the felony first degree murder and twenty years for the aggravated child abuse. The trial court ordered that these sentences be served concurrently. Appellant now appeals his convictions and sentence arguing that: (1) the trial court erred in overruling his objection to the State's use of its peremptory challenges at jury selection; (2) the evidence was insufficient to support his convictions; (3) the trial court erred in allowing certain photographs into evidence; and (4) the trial court erred by imposing an excessive sentence. After a thorough review of the record, we conclude that Appellant's issues do not require reversal. Therefore, the judgments of the trial court are affirmed.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.

JERRY L. SMITH, J., delivered the opinion of the court, in which J.C. MCLIN and CAMILLE R. MCMULLEN, JJ., joined.

Phyllis Aluko, Assistant Public Defender, Memphis, Tennessee, for the appellant, Eric Cathey.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; William L. Gibbons, District Attorney General, and Scott Bearup, Assistant District Attorney General for the appellee, State of Tennessee.

## OPINION

### *Factual Background*

Jennifer Pegg, the victim's mother, found out she was pregnant in June or July 2005. Appellant was the father of the baby. When Ms. Pegg informed him of the pregnancy, he was not happy and stated that he had a son and did not want any other children. Towards the end of July 2005, Appellant disappeared. Appellant would call Ms. Pegg once a month from anonymous telephone numbers. He told her he was incarcerated in Mississippi.

The victim was born March 10, 2006. Appellant did not come to the hospital to see Ms. Pegg or the baby. Ms. Pegg took the victim to see Appellant's mother within a week of her birth. Shortly after visiting Appellant's mother, Appellant called and stated that he wanted to see the victim. Ms. Pegg picked up Appellant and brought him back to her house. The visit went well, and Appellant stayed the night. Towards the end of April, Appellant and Ms. Pegg had a discussion about Appellant staying at her house to care for the victim while Ms. Pegg returned to work. She returned to work shortly thereafter. Ms. Pegg and Appellant went to the Health Department where Appellant signed a voluntary acknowledgment of paternity.

Appellant moved into Ms. Pegg's house when the victim was about a month old. He was unemployed. Appellant was responsible for taking care of the basic needs of the victim. The victim was not a fussy baby and would sleep for four or six hours at a time. Both Ms. Pegg and her mother stated that Appellant was good with the baby and took good care of her.

On May 7, 2006, Ms. Pegg found a check stub in Appellant's wallet. The check stub showed that Appellant had a job in Missouri during the time he had told Ms. Pegg that he was incarcerated in Mississippi. Ms. Pegg and Appellant had an argument about the check stub that night. After the argument, Ms. Pegg went to sleep in her bedroom. Appellant slept in the living room. The victim slept in a bassinet in the living room.

The next morning, May 8th, Ms. Pegg got up to get ready for work. The victim was with Appellant during the day. Appellant came to pick Ms. Pegg up at work. The victim was awake. When they got home, Ms. Pegg gave the victim a bottle, and the victim took eight ounces. Ms. Pegg slept in the bedroom again. Appellant and the baby stayed in the living room.

On May 9th, Ms. Pegg did not have to be at work until 3:00 in the afternoon. She spent the morning with the victim. Ms. Pegg fed the victim a bottle and placed the victim

in her infant swing. The victim was given a second bottle. The victim fell asleep after the second bottle, and Ms. Pegg placed the victim on her stomach on the couch. Before Ms. Pegg left for work, she rubbed the victim on the back. The victim responded to Ms. Pegg's touch and was breathing. Ms. Pegg arrived at work at 3:00 p.m.

Ms. Shirley Pegg is Ms. Pegg's mother and the victim's grandmother. Ms. Shirley Pegg stopped by the house around 2:40 p.m. Ms. Pegg had already left for work. Ms. Shirley Pegg saw the victim asleep on the couch. Ms. Shirley Pegg patted the victim, and the victim squirmed and sighed. The victim did not wake up. She left the house and went to work.

Ms. Pegg called Appellant around 5:00 p.m. to check in with him. Appellant was very agitated and sounded aggravated on the phone. He gave only short answers to Ms. Pegg's questions, and he did not want to talk to her at that time. Ms. Pegg heard the victim crying and Appellant told Ms. Pegg that the victim had just woken up and needed a bottle and a diaper change. The conversation lasted about two minutes.

Around 5:15 p.m. to 5:20 p.m., Ms. Pegg was working with a customer. Her cellphone was ringing repeatedly in the back room. She left her customer and answered the cellphone. Appellant was on the phone. He was very excited, and he kept repeating himself. After he calmed down, Appellant told Ms. Pegg that the baby was not breathing and told Ms. Pegg to come home immediately. Ms. Pegg told Appellant to call 911 and left work to drive home.

Ms. Shirley Pegg got to work at 5:00 p.m. Around 5:25 p.m., Appellant called her at work and told her that something was wrong with the baby. He told Ms. Shirley Pegg that the victim was not breathing. Ms. Shirley Pegg said that Appellant sounded calm when he called her. She told him to hang up the phone and call 911. Appellant hung up the phone. Ms. Shirley Pegg began to call both her daughter and Appellant, but neither of them picked up the phone. She left work and went to her daughter's house.

Matthew Tomek is a dispatcher with the Memphis Fire Department. On May 9th, he received a phone call from Appellant stating that there was a child who was not breathing. Appellant was calm during his call with the dispatcher. Mr. Tomek sent a request to send an ambulance to the residence. Mr. Tomek instructed Appellant on how to administer CPR until the ambulance arrived.

Mr. Kenneth Newton is a paramedic with the Memphis Fire Department. He received a call from dispatch on May 9th. He arrived at the scene at 5:39 p.m. He found an almost two-month-old baby who was not breathing. The paramedics brought the victim into the

ambulance for treatment. The baby was blue in her face and extremities. She had a pulse rate of 30. The normal pulse rate for an infant is 140. Her eyes were open, but her pupils were fixed and did not react to light. She was not moving. Mr. Newton did not notice any external injuries. Mr. Newton intubated the victim in order to begin breathing for the victim. A fireman began CPR. Mr. Newton also administered epinephrine in order to start the victim's heart. The paramedics took the victim to Delta Medical Center.

Ms. Pegg arrived home seven minutes after she got off of the phone with Appellant. When she arrived home, an ambulance and a fire engine were in front of her house. A fireman told her that Appellant and the victim were already in the ambulance to go to the hospital. Ms. Pegg followed the ambulance to the hospital. Ms. Shirley Pegg arrived after the ambulance had left. She later went to the hospital.

Dr. Michael Johnson is an emergency room doctor at Delta Medical Center. He was in the emergency room when the victim was brought by ambulance from her house. Immediately upon arrival, Dr. Johnson determined that the victim required a level of care above what they could provide her at Delta Medical Center. He notified Le Bonheur Children's Hospital ("Le Bonheur") that the victim would be transported to their facility. Before she was transported, Dr. Johnson focused on oxygenating and ventilating the victim. He noted that the victim was not able to breath on her own, but she did have a heartbeat. The victim did not react to any type of stimuli. Dr. Johnson stated that the victim had no neurological signs of life other than a heartbeat. After they completed the above treatment, they waited for someone from Le Bonheur to arrive to take the victim to the other hospital. The staff at Delta Medical Center kept the victim oxygenated and ventilated while they waited. When the person arrived from Le Bonheur, Dr. Johnson transferred care of the victim to the other hospital.

At the hospital, Ms. Pegg was not allowed to see the victim until the hospital staff at Delta Medical Center stabilized her. When Ms. Pegg saw the victim, she was hooked up to an oxygen machine. The victim's eyes were wide open, but they were not moving. The victim was transferred to Le Bonheur Children's Hospital.

Doctor Mark Bugnitz is the Director of Pediatric Training at Le Bonheur. As part of his position, Dr. Bugnitz treats patients in pediatric intensive care. He treated the victim when she was brought to Le Bonheur. She was admitted to the Intensive Care Unit ("ICU") at 8:25 p.m. on May 9, 2006. When she was admitted, the victim was already hooked up to a ventilator because she could not breathe enough on her own to stay alive. The doctors in the ICU conducted several tests and concluded that her condition was so serious that heroic efforts to save the child would be futile. They kept her hooked up to the ventilator, kept IV fluids running, and monitored the victim's condition. When Dr. Bugnitz first saw the victim

in ICU, she had gasping respirations but did not respond to any other stimuli. The only evidence of any functioning in her brain was the gasping respirations.

Dr. Bugnitz stated that the victim had no external injuries. However, in his experience in shaken baby cases, there is often no evidence of external injuries for several days. He testified that he had cared for babies who had been severely shaken, and they had never shown any external injuries. A CT scan was one of the tests administered to the victim upon admittance. The results of the CT scan showed that the victim had a severe brain injury. She had bleeding on the left side of her brain and there were several areas of cerebral edema, which is swelling of the brain. The CT scan also showed subdural hemotomas, especially on the left side of the brain. Subdural hemotomas are caused by the shearing of the blood vessels in the brain. Subdural hemotomas are an indication of how severe a brain trauma is. Dr. Bugnitz stated that the main cause of subdural hemotomas is a trauma to the head. He stated that a large amount of force to the head is needed to cause subdural hemotomas. He stated that this can be caused by child abuse or sometimes car accidents. Dr. Bugnitz stated that there was no way to reverse the damage to the victim's brain.

Dr. Bugnitz spoke with the family in the waiting room. Appellant was present. The history given to Dr. Bugnitz was that the victim was on the couch and was doing fine. Appellant went into the kitchen to get a bottle for the victim and gave the baby the bottle. According to Appellant, about thirty minutes later, the baby was not breathing right and was not responsive. Dr. Bugnitz did not know of any other medical problems. His opinion was that someone had beaten and hurt the baby. He did not believe that the history given matched the extent of the victim's injuries.

When a juvenile patient is admitted with a degree of injury that does not match the history given, the doctors conduct a skeletal survey. During a skeletal survey, x-rays are conducted of the patient's entire body. Dr. Bugnitz testified that they conducted a skeletal survey of the victim. There was no skull fracture, but there was a fracture to the clavicle. There was also evidence of a possible eighth rib fracture. The victim had also sustained fractures to her humerus bone in her arm and fractures on both femurs and both tibias in her legs. The fractures were located between the long parts of the bones and the growth plates. Dr. Bugnitz stated that fractures to this particular area of the leg are evidence of child abuse because the fractures are usually caused by twisting the legs with force. All the fractures except for the fracture to the humerus were very recent fractures. Dr. Bugnitz stated that he could tell they were more recent because there was no evidence of healing. Fractures in infants usually start to show healing within a week or two. Dr. Bugnitz's conclusion regarding the victim's injuries was that they were non-accidental trauma.

Another step taken by Dr. Bugnitz was to call an ophthalmologist. When there is severe trauma to the brain caused by shaking, the victim's retinas will have retinal hemorrhages because of force to the back of the retinas. The ophthalmologist is called to determine whether retinal hemorrhages are present in the victim. With regard to the victim in this case, the doctors found retinal hemorrhages in both retinas. The amount of force needed to cause such an injury is severe.

Dr. Bugnitz also called a doctor who specializes in child abuse cases, Dr. Robert Walling. Dr. Walling is called to perform child abuse consultations in order to give a second opinion. The resulting conclusion after all the tests and the child abuse consultation was completed was that the victim had been physically abused by someone. Dr. Bugnitz stated that "[d]ifferent age fractures to a baby who has no reason to have easy fracture, and a story that in no way could explain any of these injuries but the severity of the head injury plus the fractures, especially the different ages of fractures . . ." leads to the conclusion that the victim was physically abused. He also stated that the presence of the retinal hemorrhages "was the icing on the cake" because it is rare that he has seen such an injury without the presence of severe head trauma. Dr. Bugnitz also testified that after suffering this type of an injury the baby would not have appeared to be asleep. He stated that the effect of this severe of an injury happens immediately. The baby would have immediately began gasping for breath caused by the swelling and bleeding in the brain. If the patient was fine at 2:45 p.m., she could not have sustained this injury prior to that time.

The family remained in the waiting room at the hospital. Ms. Shirley Pegg noticed that Appellant did not seem nervous. The rest of the family was pacing in the waiting room, but Appellant seemed very calm. Ms. Pegg was able to speak with Appellant and ask him what had happened. He told Ms. Pegg that he fed the victim and that she quit breathing. She said that he just repeated himself over and over when she asked him.

The doctors informed Ms. Pegg that the x-rays showed that the victim had many broken bones and fractures. They also told her that the victim had blood on her brain. The victim remained on life support, but her condition never improved. Dr. Bugnitz testified that they performed a brain death exam to determine if the victim's brain was functioning. At the first exam, the victim was able to breath a little bit on her own. Subsequent to the first brain death exam, the victim stopped breathing even while hooked up to the respirator. The doctor spoke with Ms. Pegg. He informed her that the victim had no response to pain, her eyes did not respond to light, she did not cough, she did not gag, and she did not swallow. He also told Ms. Pegg that the injuries were irreversible. After a total of six days in the hospital, Ms. Pegg decided to end life support for the victim based upon the advice of the doctors at the hospital that the victim would never recover. The victim died on May 15, 2006. Dr. Bugnitz

specifically stated that the injuries incurred on May 9th were the direct cause of the victim's death.

In May 2006, Sergeant Terry Pirtle was a Child Abuse Investigator. He investigated the case involving the victim. As part of this investigation, Sergeant Pirtle interviewed Ms. Pegg and Ms. Shirley Pegg. He interviewed Appellant on May 10, 2006. Sergeant Pirtle read Appellant his *Miranda* rights, and Appellant signed a waiver of these rights. Appellant told Sergeant Pirtle that when the baby woke up Appellant got the baby and took her to a different part of the house. Appellant told Sergeant Pirtle that he was the main care giver for the victim that day. Appellant did not tell Sergeant Pirtle that Ms. Pegg was alone with the baby on May 9th. He said that the baby was asleep on the couch when Ms. Pegg left for work. Appellant also told Sergeant Pirtle that Ms. Shirley Pegg came by after Ms. Pegg had left for work. The victim was asleep on the couch and was fine.

Appellant told Sergeant Pirtle that Ms. Pegg called around 5:00 p.m., and the victim was still asleep on the couch. Appellant told Sergeant Pirtle that the baby woke up after Ms. Pegg called. He fixed the baby a bottle and fed it to her. After feeding her, Appellant went to get the baby to change her diaper, but he noticed that something was wrong with the baby. He said that the baby began crying after being fed and she had "some type of color around her mouth." Appellant said that the baby appeared lifeless when he picked her up. He told Sergeant Pirtle that he shook the baby to see what was wrong. He explained that he shook the baby to wake the baby up. Appellant attempted to distinguish the way in which he shook the baby compared to the way the doctor said the baby had to have been shaken to cause the injuries. Appellant told Sergeant Pirtle that when the victim would not respond he called Ms. Pegg. He stated that Ms. Pegg told him to call 911. He hung up with Ms. Pegg. Instead of calling 911, Appellant called Ms. Shirley Pegg who told him to call 911. After speaking with Ms. Shirley Pegg, Appellant called 911. Appellant signed and dated the statement.

Appellant was arrested at the hospital. When he was arrested, he did not say bye to the victim. He was very concerned about the fact that he was going to jail and did not have socks. When Ms. Pegg visited Appellant at a later date to inform him of the victim's death, he seemed more concerned about the effect on him rather than the fact that his baby was dead.

Dr. Karen Elizabeth Chancellor is the Chief Medical Examiner for Memphis and Shelby County. On May 16, 2006, Dr. Chancellor conducted an autopsy on the victim. She noted that there were minimal external injuries. She found three linear bruises, one on the forehead and two on the chest. Dr. Chancellor found a fracture to the left clavicle. She stated that the clavicle fracture was related to a fracture of the first rib immediately underneath the clavicle. She also found a subtle fracture of the humerus. The fracture was

at the end of the bone where it would grow as the child grew. Dr. Chancellor stated that this was a group of three injuries to the shoulder area. There were also fractures to the seventh, eighth and ninth ribs on the right side of the body. Dr. Chancellor also found a hole in the small intestine that was associated with a hemorrhage. With regard to the victim's legs, Dr. Chancellor found a hemorrhage near both of the victim's shins close to the knees. She verified that both legs contained fractures in that area.

At this point, Dr. Chancellor began her analysis of the victim's head. Under the linear bruise on the victim's forehead, Dr. Chancellor found a hemorrhage. She further discovered that the victim's brain was "extremely swollen" and very soft. There was a hemorrhage on both sides of the brain. She identified this bleeding as a subdural hemorrhage. Dr. Chancellor also identified multiple hemorrhages in the victim's retinas. Dr. Chancellor took tissue samples from the victim's main organ systems. She found no abnormalities in the samples other than those caused by the injuries.

Dr. Jennifer Love, a forensic anthropologist, conducted part of the autopsy. Dr. Love's specialty is the analysis of injuries to the bone. Dr. Love analyzed the left clavicle, first rib and humerus; the lower femurs and upper tibias of both of the victim's legs; and the seventh, eighth and ninth ribs on the victim's right side. The fractures to the left clavicle and first rib were complete fractures and were tension compression fractures. This type of fracture is caused by direct force bending the bone. Dr. Chancellor stated that either direct pressure was put on the bones, the body was thrown up against something, or something struck the body in this area. With regard to the humerus and the legs, the fractures occurred to the part of the bone where new bone was forming connected while the victim was growing. These fractures were caused by indirect force. They could be caused by pulling or twisting of the arm or leg; swinging the child by the arm or leg; or even by violent shaking when the child's chest is held, but the arms and legs flail around. The three ribs on the right side were fractured where the ends of the ribs meet the breast bone. Dr. Chancellor testified that all of the fractures were in an early state of healing. The appearance of the healing was consistent with six days of healing. In her opinion, the victim's injuries occurred within the six to eight days before death.

Dr. Chancellor concluded that the victim's death was caused by multiple blunt force injuries. She stated that the victim had sustained multiple fractures. A child of that age was "not capable of moving to a point to sustain these types of injuries." She stated that some injuries on their own could be considered accidental, but the number of injuries sustained in this case leads to the conclusion that the injuries were inflicted by another person. Dr. Chancellor stated that the fractures to the right ribs might have occurred while cardiopulmonary resuscitation was occurring, but the remaining fractures were "not accidental in any way."

Dr. Karen Lakin is the Medical Director for the Child Assessment Program at Le Bonheur. She reviewed the victim's medical records from both Delta Medical Center and Le Bonheur, the victim's x-rays and CT scans, interviews conducted during the investigation, the autopsy report, and photographs of retinal hemorrhages. At trial, she testified regarding her conclusions based upon the records set out above.

Dr. Lakin stated that when the victim was brought to Le Bonheur she was "severely critically ill." In fact, the victim was near death. She stated that on May 10th, Dr. Walling was called to consult on the victim's condition. In his role as "child abuse consultant," Dr. Walling was to be as objective as possible with regard to the victim's family and coordinate all the reports regarding the victim's condition. The "child abuse consultant" is not technically a treating physician, but rather gives a different viewpoint for treatment and possibly requests additional information. Dr. Lakin read Dr. Walling's report and agreed with his findings. His report stated that the victim had sustained significant injuries to her brain and eyes and that such injuries could not be explained by a fall. In addition, the victim had no history of trauma and that fact in combination with the cerebral edema and lack of oxygen to the brain was indicative of abusive head trauma. Dr. Lakin testified that the fact that there was no history of trauma and the number of injuries led to the conclusion that the injuries were the result of "intentional shaking and impact."

Dr. Lakin also gave a very detailed explanation of the victim's injuries as shown in x-rays and a CT scan of the victim's brain. She stated on more than one occasion that the injuries depicted in the x-rays and the CT scan were indicative of some sort of significant impact and were of the type often seen in child abuse cases. She testified that the fact that the victim had bilateral retinal hemorrhages was also indicative of significant trauma. Such hemorrhages are rarely seen in children and occur in the case of high impact injuries, such as a car accident. In one eye, the victim had a "retinal fold" which Dr. Lakin testified is almost exclusively caused by abusive head trauma. Regarding fractures in the victim's legs, Dr. Lakin stated that when analyzing the x-rays, she found additional fractures to the femurs that the medical examiner had not found. The fractures were metaphyseal fractures caused by grabbing or pulling the victim's legs. The victim had also suffered a duodenual perforation. Dr. Lakin testified that such an injury is associated with a blow to the to the abdomen or a rib fracture.

Dr. Lakin stated that a baby who had sustained either a duodenal perforation or a traumatic head injury would not eat. The history given by the family stated that the victim ate around 5:00 p.m. and that she was having problems breathing around 5:20 p.m. to 5:30 p.m. Therefore, Dr. Lakin concluded that the injuries occurred sometime between 5:00 p.m. and 5:20 p.m. or 5:30 p.m.

Appellant's sister, Latausha Cathey, testified on his behalf. She stated that she had seen Appellant and the victim together on one occasion when Appellant was helping his mother pack to move. Ms. Cathey said that Appellant was a caring father. She was present at the hospital on May 10th, the morning after the victim was admitted. She testified that she saw Appellant at the cafeteria and he was very upset. Normally, he had a calm demeanor. Ms. Cathey testified that Appellant had another child, a boy, E.C., who was six years old at the time of the trial. Appellant had been involved with E.C. since he was born. Ms. Cathey was not present at the hospital when Appellant was arrested. A family member informed her of the arrest.

Appellant also testified at trial. He stated that on May 9th he was living with Ms. Pegg and the victim. He had been living there for approximately four weeks. Between the time that Ms. Pegg informed Appellant of her pregnancy and when the victim was about one month old, Appellant was living in Missouri. Appellant stated that he returned at the beginning of April to be with the victim. He first saw the victim on April 10th. The victim was one month old that day. Ms. Pegg and Appellant decided that Appellant would move into the house and take care of the victim while Ms. Pegg went to work. He stated that he stayed home and took care of the victim's basic needs every day. Appellant testified that he had a strong bond with the victim.

On May 9th, Appellant woke up around 8:00 or 9:00 a.m. He got the baby and went to the living room so that they would not wake Ms. Pegg. He followed his regular routine of caring for the baby. Ms. Pegg was not scheduled to work until 3:00 p.m. that afternoon. Ms. Pegg came into the living room around 10:00 a.m. or 11:00 a.m. Ms. Pegg played with the baby, and Appellant did some housework. Appellant estimated he was out of the room for about an hour. Appellant heard the victim cry while he was out of the room.

Appellant took the baby and sat down on the couch with her. Ms. Pegg started to get ready for work. The victim fell asleep while Appellant held her. Appellant laid the baby on her stomach on the couch to sleep. Ms. Pegg left for work around 2:00 p.m. Before she left, Ms. Pegg kissed the baby goodbye. The baby twitched in her sleep when Ms. Pegg kissed her. Ms. Shirley Pegg arrived at the house around 2:45 p.m. Ms. Shirley Pegg visited with Appellant and checked on the victim. The victim was still asleep on the couch.

Shortly before 5:00 p.m., Appellant decided to wake the baby so he could feed her and change her diaper. However, Ms. Pegg called him before he could wake her. He told Ms. Pegg that he would have to call her back. He testified that he did not use an agitated voice. He fed the victim around 5:00 p.m. The victim did not wake up. He laid her on her side and propped the bottle on a towel to hold it in her mouth. He sat next to the victim on the couch.

Appellant was not sure whether the victim drank the bottle, but he stated that the milk "went somewhere." He tried to wake her at this point.

When Appellant touched the victim, she did not move or react. Appellant panicked. He shook her in an attempt to wake her up. The victim's held fell back into his hand and her arms fell out to the side. Appellant ran to get the telephone. After he called Ms. Pegg and Ms. Shirley Pegg, Appellant called 911. He tried to administer CPR after speaking with Ms. Pegg. When he called 911, they gave him instructions on how to perform CPR. He followed the instructions and performed CPR until the paramedics arrived.

The paramedics arrived about four minutes after Appellant called 911. Appellant carried the victim out to the paramedics. The paramedics took the victim and began caring for her. Appellant ran back into the house to get dressed, so he could ride in the ambulance with the victim. Ms. Pegg arrived on the street when the ambulance was leaving the house. She followed them to the hospital. When they arrived at the hospital, the family remained in the waiting room. The victim was transported to Le Bonheur. Ms. Pegg rode in the ambulance with the victim. Once again, the family remained in the waiting room. The medical staff began asking the family questions about what had happened. Appellant told the same story to the medical staff and the police. The doctors told them that someone had shaken the baby really hard and caused the injuries. Appellant said that he told the police he shook the victim in order to wake her up. Appellant was at the hospital from May 9th to when he was arrested on May 10th. A chaplain at the jail informed him that the victim had died. He denied that Ms. Pegg came to jail to tell him that the victim had died.

Appellant testified that he did not know what had happened to the victim. Appellant stated that for the three hours that the victim was asleep he had not paid attention to her breathing pattern. He denied beating or punching the victim. He admitted that he had shaken the victim, but he stated that he had not shaken her hard enough to cause the injuries. He testified that he could not explain the injuries.

Based on the foregoing evidence the jury convicted the Appellant for one count of first degree felony murder, one count of aggravated child abuse, and one count of aggravated child neglect. The trial court held a sentencing hearing on May 23, 2008. The trial court merged the aggravated child abuse and child neglect convictions. The trial court imposed a life sentence for the felony murder and twenty years for aggravated child abuse to be served concurrently. Appellant filed a timely notice of appeal.

-11-

## ANALYSIS

## Jury Selection

Appellant argues that the trial court erred in overruling its objection to the State's use of its peremptory challenges at jury selection. Appellant argues that the State was using its peremptory challenges to strike African-American jurors from the jury in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, (1986). The State argues that Appellant did not establish a prima facie case of discrimination.

In *Batson*, the United States Supreme Court held that "the equal protection clause forbids the prosecutor to challenge jurors solely on account of their race." *Id.* at 89. In *J.E.B. v. Alabama, ex rel. T.B.*, 511 U.S. 127, 114 S. Ct. 1419 (1994), the Court extended the *Batson* prohibition to peremptory strikes based on gender, as well. 511 U.S. at 130-31.

More recently in *State v. Spratt*, 31 S.W.3d 587 (Tenn. Crim. App. 2000), this Court addressed the policy reasons for prohibiting race- or gender-based peremptory strikes and the procedure for invoking the protection created by *Batson* and *J.E.B.* in the following manner:

> "The peremptory challenge is one of the oldest established rights of the criminal defendant." *United States v. Annigoni*, 96 F.3d 1132, 1136 (9th Cir. 1996). For more than one hundred years, the United States Supreme Court has recognized that peremptory challenges are "an essential part of the trial." *Lewis v. United States*, 146 U.S. 370, 376, 13 S. Ct. 136, 138, 36 L. Ed. 1011 (1892). The Supreme Court has also stated that the right of peremptory challenge is "one of the most important of the rights secured to the accused." *Pointer v. United States*, 151 U.S. 396, 408, 14 S. Ct. 410, 414, 38 L. Ed. 208 (1894). The importance of the right to make peremptory challenges is demonstrated by the extraordinary remedy courts have traditionally afforded to an accused who was deprived of the right: reversal of conviction, without a showing of prejudice. *Lewis*, 146 U.S. at 376, 13 S. Ct. at 138. "Peremptory challenges, along with challenges for 'cause,' are the principal tools that enable litigants to remove unfavorable jurors during the jury selection process." *Annigoni*, 96 F.3d at 1137. "The central function of the right of peremptory challenge is to enable a litigant to remove a certain number of potential jurors who are not challengeable for cause, but in whom the litigant perceives bias or hostility." *Id.* "The function of the [peremptory] challenge is not only to eliminate extremes of partiality on both sides, but to assure the parties that the jurors before whom they try the case will decide on

the basis of the evidence placed before them, and not otherwise." *Swain v. Alabama*, 380 U.S. 202, 219, 85 S. Ct. 824, 835, 13 L. Ed.2d 759 (1965), *overruled on other grounds*, *Batson*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed.2d 69.

*Spratt*, 31 S.W.3d 597-98.

This Court also set out the following procedure in the lower court for raising a challenge to the use of peremptory strikes:

> To invoke the protections of *Batson* and its progeny, the [proponent of a *Batson* challenge] must establish a prima facie case that a juror is being challenged on the basis of race. *Purkett v. Elem*, 514 U.S. 765, 767, 115 S. Ct. 1769, 1770-71, 131 L. Ed.2d 834 (1995); *Batson*, 476 U.S. at 93-94, 106 S. Ct. at 1721. Once the [proponent of the *Batson* challenge] has presented a prima facie case, the trial court shall require the [opponent] to give a race-neutral reason for the challenge. *Purkett*, 514 U.S. at 767, 115 S. Ct. at 1770-71; *McCollum*, 505 U.S. at 59, 112 S. Ct. at 2359. "The race or gender neutral explanation need not be persuasive, or even plausible . . . . Unless a discriminatory intent is inherent in the [opponent's] explanation, the reason offered will be deemed race neutral." *Purkett*, 514 U.S. at 767, 115 S. Ct. at 1770-71. If a race or gender neutral explanation is given, the court must then determine, given all the circumstances, whether the proponent has established purposeful discrimination. *Purkett*, 514 U.S. at 767, 115 S. Ct. at 1770-71; *Batson*, 476 U.S. at 96-98, 106 S. Ct. at 1723-24.
>
> "The trial judge must carefully articulate specific reasons for each finding on the record, i.e., whether a prima facie case has been established; whether a neutral explanation has been given; and whether the totality of the circumstances support a finding of purposeful discrimination." *Woodson v. Porter Brown Limestone Co., Inc.*, 916 S.W.2d 896, 906 (Tenn. 1996). "The trial court's factual findings are imperative in this context." Id. "On appeal, the trial court's findings are to be accorded great deference and not set aside unless clearly erroneous." *Id.* (citation omitted). "Thus, specificity in the findings is crucial." *Id.*

*Spratt*, 31 S.W.3d at 595-96.

During jury voir dire, Appellant raised a *Batson* challenge based upon the State's peremptory challenges against three African-American jurors, Mr. Cortez Thomas, Ms. Brenda Taylor, and Mr. Adrian Tunstall. The State responded that there were independent reasons why the jurors were stricken. The State said Mr. Cortez Thomas was stricken because his answer to one of the State's questions was very negative. The question was whether Mr. Thomas could tell if someone was a child abuser by looking at them, and the State believed that Mr. Thomas's response was very negative and that he had a loud reaction to the question. With regard to Ms. Taylor, the State struck her from the jury because her brother was involved in a child custody dispute at the time of the trial. The State believed that the issue of child custody would be important to the case. The State also struck Mr. Tunstall from the jury. The peremptory challenge against Mr. Tunstall was based on body language. The State believed that Mr. Tunstall was not paying attention and did not make eye contact with the attorney during the entire voir dire. According to the State, Mr. Tunstall sat with his arms crossed and his feet out. The trial court overruled Appellant's objection and found that there had been no abuse.

Appellant argues in his brief that the State's offered explanations for the peremptory challenges were insufficient. In addition, Appellant argues that the trial court made insufficient findings when ruling on Appellant's *Batson* challenge. As stated above, the trial court's factual findings concerning a *Batson* challenge are imperative for appellate review. *Woodson*, 916 S.W.2d at 906.

After reviewing the record, we must agree with Appellant that the trial court's findings consist of a statement that the court found no abuse and the objection was overruled. Our supreme court faced a similar situation in *State v. Hugueley*, 185 S.W.3d 356 (Tenn. 2006). In *Hugueley*, the defendant objected to the State's use of a peremptory strike against five members of the jury venire. 185 S.W.3d at 369-71. After each objection, the State offered its reason for the peremptory strike, and the trial court overruled the objection. As in the case at hand, the trial court in *Hugueley* did not make specific findings with regard to the three-pronged procedure for a *Batson* challenge: the demonstration of a prima facie case of discrimination; a race-neutral explanation for the use of the peremptory strike; and the trial court's determination as to whether purposeful discrimination has been established. *Id.* at 371-75. After acknowledging the fact that the trial court did not make specific findings as required by *Batson* and its progeny, our supreme court went on to extensively review the record and determine whether the peremptory strikes fell within the requirements of *Batson*. Therefore, this Court will follow the same procedure in the case at hand.

As stated above, the first prong is the demonstration of a prima facie case of discrimination based upon the peremptory strike. In the case at hand, the trial court did not make specific findings as to whether it found a prima facie case of discrimination. In

*Hugueley*, our supreme court "assumed that the [*Hugueley*] trial court determined that . . . Defendant had made out a prima facie case of impermissible discrimination." *Id.* at 371. Our supreme court based this assumption on the fact that the State proffered race-neutral reasons for the use of the peremptory strikes. Our supreme court stated that the fact that "the prosecutor's response to the objection clearly implies that the trial court expected the State to proffer its reasons" and that "the trial court indicated in some fashion that the second prong of the *Batson* analysis was called into play." *Id.*

We conclude that the same analysis applies to the case at hand. Appellant lodged his objection based upon *Batson*. The State then responded with race-neutral reasons for the peremptory strikes. Therefore, this Court must assume that the trial court indicated to the parties at trial that the second prong of the *Batson* analysis was required.

After a race-neutral explanation is provided for the peremptory challenges, the *Batson* analysis anticipates the trial court making specific findings regarding whether or not discrimination is present in the challenges. In *Hugueley*, as in the case at hand, the trial court did not make specific findings. In the absence of specific findings, our supreme court in *Hugueley*, analyzed whether there was discrimination present based upon the record on appeal. *Id.* at 373-75.

The analysis began with an examination of the United State Supreme Court case, *Miller-El v. Dretke*, 545 U.S. 231, 125 S. Ct. 2317 (2005) ("*Miller-El II*"). In *Hugueley*, our supreme court stated that *Miller-El II* "expounded on the methodology used to assess a *Batson* claim." 185 S.W.3d at 371. The Supreme Court's opinion in *Miller-El II* analyzed what percentage of African-American jury venire members the State struck by peremptory challenge; conducted a side-by-side comparison of African-American venire members who were struck compared with Caucasian venire members allowed to serve; analyzed "'disparate questioning' of the venire members, depending upon the member's race[;]" and the history of the prosecutor's office systematically excluding African-American jurors from jury panels. *Id.* at 372-73.

Our supreme court applied these principles when analyzing the facts in *Hugueley*. *Id.* at 373-75. Our supreme court did not have the amount of information on the racial make-up of the jury venire that the Court in *Miller-El II* did. However, the Court relied upon the U.S. Census figures for the county in question to infer the racial makeup of the jury venire. In *Hugueley*, the court stated, "The United States 2000 Census provides that 41% of the population of the county in which Defendant was tried is black or African-American. It is reasonable to infer, therefore that a significant portion of the venire panel was African-American." *Id.* at 374-75.

The State exercised three peremptory challenges against the jurors in question. The State had more peremptory challenges available to use. The record on appeal gives this Court no knowledge of the final racial make-up of the jury. When viewing the Census statistics on the internet, the Census website provides that 52% of the population of Shelby County is African-American.[1] Therefore, as in *Hugueley*, we can infer that a significant portion of the venire was African-American. In addition, we point out that Appellant peremptorily challenged five jurors, four of whom were Caucasian. This prompted a *Batson* challenge by the State which the trial court overruled. As our supreme court said in *Hugueley*, "[t]hese bare statistics do not, in and of themselves, convince us that the State's proffered race-neutral reasons for excusing the [jurors] were merely pretextual." *See id.* 374.

Also as in *Hugueley*, a review of the jury voir dire shows that there was no disparate treatment of the jurors in questioning based upon their race. *See id.* at 375. The questioning by the State of all the potential jurors was consistent throughout the voir dire. We have not found any inconsistency based upon the race of the juror or any other factor. Nor does the record demonstrate that the State tailored its question regarding any issue based upon the race of the potential juror. Finally, as in *Hugueley*, the record before us does not demonstrate a history of the State excluding African-Americans from juries in Shelby County. *See id.*

Our supreme court in *Hugueley* determined that based upon this analysis of the record there was no basis to find that the trial court erred in denying the defendant's *Batson* challenge. *Id.* Faced with a similar record before us, we have followed the same analysis and determined likewise. Therefore, our review of the record leads us to the conclusion that the trial court did not err in overruling Appellant's *Batson* motion.

### Sufficiency of the Evidence

Appellant argues that the evidence was insufficient to support his conviction of felony murder, aggravated child abuse, and aggravated child neglect. Appellant states that a reasonable trier of fact could not conclude that he was the source of the injuries in question. In the alternative, Appellant argues that the State did not prove that Appellant knowingly treated the victim in such a way as to cause the injuries that caused her death. The State argues that the evidence is sufficient to support Appellant's convictions.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A verdict of guilty, rendered by a jury and "approved by the trial judge, accredits the testimony of the" State's witnesses and resolves all conflicts in the testimony in favor of the State. *State v. Cazes*, 875 S.W.2d

---

[1] http://quickfacts.census.gov/qfd/states/47/47157.html (the information is provided in a chart).

-16-

253, 259 (Tenn. 1994); *State v. Harris*, 839 S .W.2d 54, 75 (Tenn. 1992). Thus, although the accused is originally cloaked with a presumption of innocence, the jury verdict of guilty removes this presumption "and replaces it with one of guilt." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence. *Id.* The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Harris*, 839 S.W.2d at 75. In making this decision, we are to accord the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." *See Tuggle*, 639 S.W.2d at 914. As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990).

Circumstantial evidence alone may be sufficient to support a conviction. *State v. Tharpe*, 726 S.W.2d 896, 899-900 (Tenn. 1987); *State v. Gregory*, 862 S.W.2d 574, 577 (Tenn. Crim. App. 1993). The circumstantial evidence "'must be not only consistent with the guilt of the accused but it must also be inconsistent with innocence and must exclude every other reasonable theory or hypothesis except that of guilt, and it must establish such a certainty of guilt of the accused as to convince the mind beyond a reasonable doubt that [the defendant] is the one who committed the crime.'" *Tharpe*, 726 S.W.2d at 900 (quoting *Pruitt v. State*, 460 S.W.2d 385, 390 (Tenn. Crim. App. 1970)).

Felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, act of terrorism, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect or aircraft piracy." T.C.A. § 39-13-202(a)(2). Tennessee Code Annotated section 39-13-202 also provides that "[n]o culpable mental state is required for conviction under subdivision (a)(2) . . . except the intent to commit the enumerated offenses or acts." T.C.A. § 39-13-202(b). Additionally, the death must occur "in the perpetration of" the enumerated felony. *State v. Hinton*, 42 S.W.3d 113, 119 (Tenn. Crim. App. 2000) (citations omitted). The killing may precede, coincide with, or follow the felony and still be in the perpetration of the felony, so long as there is a connection in time, place, and continuity of action. *State v. Buggs*, 995 S.W.2d 102, 106 (Tenn. 1999). If the underlying felony and killing were part of a continuous transaction with no break in the chain of events and the felon had not reached a place of temporary safety

between the events, felony murder is sufficiently established. *State v. Pierce*, 23 S.W.3d 289, 294-97 (Tenn. 2000). Proof of the intention to commit the underlying felony and at what point it existed is a question of fact to be decided by the jury after consideration of all the facts and circumstances. *Buggs*, 995 S.W.2d at 107.

The statute in effect at the time of the offenses stated, "[a] person commits the offense of aggravated child abuse or aggravated child neglect or endangerment, who commits the offense of child abuse, as defined in § 39-15-401(a) or child neglect or endangerment, as defined in § 39-15-401(b) and: (1) The act of abuse or neglect results in serious bodily injury to the child . . . ." T.C.A. § 39-15-402(a)(1) (2006). At that time, Tennessee Code Annotated section 39-15-401(a) stated that child abuse occurs when "[a]ny person who knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury . . . ." T.C.A. § 39-15-401(a) (2006). "'Serious bodily injury' means bodily injury which involves: (A) A substantial risk of death; (B) Protracted unconsciousness; (C) Extreme physical pain; (D) Protracted or obvious disfigurement; or (E) Protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty . . . ." T.C.A. § 39-11-106(34). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." T.C.A. § 39-11-302(b).

As stated above, Appellant argues that a reasonable trier fact could not conclude that he was the source of the victim's injuries. The evidence at trial showed that Dr. Lakin estimated the time of the infliction of the injury occurred between 5:00 p.m. and 5:30 p.m. She based this estimation on Appellant's own statements to the doctor that the victim had a bottle and had trouble breathing between the time she had her bottle and the time he called Ms. Pegg. Ms. Pegg testified that when she spoke with Appellant around 5:00 p.m., she heard the victim crying in the background. More than one doctor at trial testified that the victim would have had trouble breathing almost immediately after sustaining her head injury. Appellant, Ms. Pegg, and Ms. Shirley Pegg testified to the fact that the victim was fine when Ms. Pegg left for work around 2:30 p.m. and when Ms. Shirley Pegg visited around 2:45 p.m. The evidence presented at trial by both the State and Appellant was that Appellant was home alone with the victim from the time Ms. Shirley Pegg left until the paramedics arrived shortly after 5:30 p.m. While there was no eyewitness to the infliction of the injuries, we conclude that the circumstantial evidence excludes every other theory but that Appellant inflicted the injuries sustained by the two-month-old victim.

Appellant also argues that the State did not prove that Appellant acted knowingly as required by the aggravated child abuse statute. As stated above, "a person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." *See* T.C.A. § 39-11-302(b). Appellant points out that

-18-

he testified that he frantically shook the baby in an attempt to awaken her and frantically administered CPR. He argues in his brief that these statements show that he was not acting knowingly as required by the statute. However, the doctors testified that the amount of force necessary to cause the brain injury sustained by the victim was equivalent to that which occurs in a car accident. In addition, the doctors testified that the fractures sustained to the victim's femurs and tibias are caused by pulling or tugging on the legs. Dr. Bugnitz, Dr. Chancellor, and Dr. Lakin all stated that the brain injury in conjunction with the multiple fractures pointed to a conclusion that the victim had been beaten.

As stated above, the jury determines the credibility of the witnesses. Clearly, the jury accredited the testimony of the doctors. We may not second-guess this determination. Based upon the medical evidence presented at trial, we conclude that a reasonable trier of fact could conclude that the amount of force necessary to inflict the injuries had to have been inflicted in such a manner that Appellant would have been reasonably certain that such force would cause the victim's injuries.

Therefore, we conclude that, when viewed in a light most favorable to the State, the evidence is sufficient to support Appellant's convictions.

## Introduction of Photographs

Appellant argues that the trial court erred in allowing photographs from the victim's autopsy into evidence. Appellant argues that: (1) a photograph of the victim's skull after the skull cap had been removed was shocking and prejudicial; (2) two photographs of the front and back of the victim's skull to indicate areas of bleeding were more prejudicial than probative and that Dr. Bugnitz had already testified to extensive bleeding; and (3) a photograph of the victim's punctured duodenum was more prejudicial than probative because it showed internal organs and blood. The State argues that the photographs were all properly allowed in evidence because their probative value outweighed their prejudicial effect.

As we begin our analysis, we note well-established precedent providing "that trial courts have broad discretion in determining the admissibility of evidence, and their rulings will not be reversed absent an abuse of that discretion." *State v. McLeod*, 937 S.W.2d 867, 871 (Tenn. 1996). To be admissible, evidence must satisfy the threshold determination of relevancy mandated by Rule 401 of the Tennessee Rules of Evidence. *See, e.g., State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978). Rule 401 defines "relevant evidence" as being "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant "evidence may be excluded if its probative

value is substantially outweighed by . . . the danger of unfair prejudice." Tenn. R. Evid. 403; *see also Banks*, 564 S.W.2d at 951.

Graphic, gruesome, or even horrifying photographs of crime victims may be admitted into evidence if they are relevant to some issues at trial and their probative value is not outweighed by their prejudicial effect. *Banks*, 564 S.W.2d at 949-51. On the other hand, "if they are not relevant to prove some part of the prosecution's case, they may not be admitted solely to inflame the jury and prejudice them against the Appellant." *Id.* at 951 (citing *Milam v. Commonwealth*, 275 S.W.2d 921 (Ky. 1955)). The decision as to whether such photographs should be admitted is entrusted to the trial court, and that decision will not be reversed on appeal absent a showing of abuse of discretion. *Id.* at 949; *State v. Dickerson*, 885 S.W.2d 90, 92 (Tenn. Crim. App. 1993).

The term "undue prejudice" has been defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Banks*, 564 S.W.2d at 950-51. In *Banks*, the Supreme Court gave the trial courts guidance for determining the admissibility of relevant photographic evidence and determined that a trial court should consider: (1) the accuracy and clarity of the picture and its value as evidence; (2) whether the picture depicts the body as it was found; (3) the adequacy of testimonial evidence in relating the facts to the jury; and (4) the need for the evidence to establish a prima facie case of guilt or to rebut the Appellant's contentions. *Id.* at 951.

In the case at hand, we conclude that there was no abuse of discretion by the trial court. The photographs in question regarding the victim's skull and brain unquestionably demonstrate a large amount of bleeding. However, they are not particularly gruesome as the pictures are focused in on the skull and brain. In addition, at trial, Appellant maintained that he had not caused the injuries in question. There was no eyewitness to the events that occurred with respect to the victim's injuries. These photographs were necessary to demonstrate the amount of bleeding that the injuries caused and, therefore, the violent force that was needed to cause such extensive bleeding. With regard to the photograph of the victim's duodenum, Appellant's description of the photograph is accurate. The photograph is a close-up shot of the victim's internal organs. A pointer shows the location of the perforation of the duodenum. This photograph is not particularly gruesome. Frankly, we can think of no other way to show the injury to the jury other than the autopsy photograph included in evidence. Therefore, we conclude that the photographs are not prejudicial and to the extent that they may be considered prejudicial their probative value outweighs any unfair prejudice.

**Sentencing**

Appellant's final argument is that the trial court imposed an excessive sentence. The trial court sentenced Appellant to life with parole for the first degree felony murder charge as set out by the statute. The trial court next merged the convictions for aggravated child abuse and aggravated child neglect into each other. After the application of four enhancement factors and no mitigating factors, the trial court sentenced Appellant to twenty years for the aggravated child abuse conviction.

Appellant argues that the trial court erred by failing to apply a mitigating factor that he attempted to administer CPR to the victim and obtain emergency assistance for his child. In addition, Appellant argues that the trial court did not set out the factual basis for its application of the four enhancement factors relied upon by the trial court: (1) Appellant had a previous criminal history; (2) the victim was particularly vulnerable; (3) the victim was treated with exceptional cruelty; and (4) Appellant abused a position of private trust. Appellant argues that the trial court's failure to apply the above mitigating factor and set out the factual basis for the enhancement factors "negates the presumption of correctness." The State argues that the sentence imposed was not excessive. The State argues that Appellant did not present a mitigating factor to the trial court at the sentencing hearing. In addition, the State also argues that while the trial court did not set out the factual basis for the application of the enhancement factors, the trial court did refer to the fact that it relied upon the parties' memorandums, the court's notes, the victim's impact statement, and the pre-sentence report.

"When reviewing sentencing issues . . . the appellate court shall conduct a de novo review on the record of the issues. The review shall be conducted with a presumption that the determinations made by the court from which the appeal is taken are correct." T.C.A. § 40-35-401(d). "[T]he presumption of correctness 'is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances.'" *State v. Carter*, 254 S.W.3d 335, 344-45 (Tenn. 2008) (quoting *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991)). "If . . . the trial court applies inappropriate mitigating and/or enhancement factors or otherwise fails to follow the Sentencing Act, the presumption of correctness fails." *Id.* at 345 (citing *State v. Shelton*, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992)). We are to also recognize that the defendant bears "the burden of demonstrating that the sentence is improper." *Ashby*, 823 S.W.2d at 169.

In making its sentencing determination, the trial court, at the conclusion of the sentencing hearing, first determines the range of sentence and then determines the specific sentence and the appropriate combination of sentencing alternatives by considering: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the pre-sentence report;

(3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts regarding sentences for similar offenses, (7) any statements the defendant wishes to make in the defendant's behalf about sentencing; and (8) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-210(a), (b), -103(5); *State v. Williams*, 920 S.W.2d 247, 258 (Tenn. Crim. App. 1995).

When imposing the sentence within the appropriate sentencing range for the defendant:

[T]he court shall consider, but is not bound by, the following *advisory* sentencing guidelines:

(1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

T.C.A. § 40-35-210(c) (emphasis added). However, the weight given by the trial court to the mitigating and enhancement factors is left to the trial court's discretion and is not a basis for reversal by an appellate court of an imposed sentence. *Carter*, 254 S.W.3d at 345. "An appellate court is . . . bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." *Id.* at 346.

"The amended statute no longer imposes a presumptive sentence." *Carter*, 254 S.W.3d at 343. As a result of the amendments to the Sentencing Act, our appellate review of the weighing of the enhancement and mitigating factors was deleted when the factors became advisory, as opposed to binding, upon the trial court's sentencing decision. *Id.* at 344. Under current sentencing law, the trial court is nonetheless required to "consider" an advisory sentencing guideline that is relevant to the sentencing determination, including the application of enhancing and mitigating factors. *Id.* The trial court's weighing of various mitigating and enhancement factors is now left to the trial court's sound discretion. *Id.*

To facilitate appellate review, the trial court is required to place on the record its reasons for imposing the specific sentence, including the identification of the mitigating and enhancement factors found, the specific facts supporting each enhancement factor found, and the method by which the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. *See id.* at 343; *State v. Samuels*, 44 S.W.3d 489, 492 (Tenn. 2001). If our review reflects that "the trial court appl[ied] inappropriate mitigating and/or enhancement factors or otherwise fail[ed] to follow the Sentencing Act, the presumption of correctness fails" and our review is de novo. *Carter*, 254 S.W.3d at 345.

As stated above, Appellant argues that the trial court failed to set out the factual basis for the implementation of the enhancement factors used to increase Appellant's sentence. After a review of the record, we agree with Appellant that the trial court failed to set out the factual basis. However, this failure removes the presumption of correctness regarding the trial court's actions, but does not prevent the Court from reviewing Appellant's sentence.

We first analyze the application of the enhancement factors. The trial court applied four enhancement factors: (1) Appellant had a previous criminal history; (2) the victim was particularly vulnerable; (3) the victim was treated with exceptional cruelty; and (4) Appellant abused a position of private trust. *See* T.C.A. § 40-35-114(1), (4), (5), (14).

Appellant's pre-sentence report was submitted as an exhibit at his sentencing hearing. The pre-sentence report contains a document entitled "Shelby County Sheriff's Office Records and Identification." This document lists several charges for Appellant including, assault (domestic) on May 23, 1999; assault (domestic violence) on March 15, 2000; violation of probation on April 7, 2000; aggravated assault on October 10, 2000; violation of probation on November 13, 2000; and two driving with a suspended license charges on January 1, 2004 and April 25, 2005. Appellant argues that these charges cannot support the enhancement factor (1), that the defendant has a previous history of criminal convictions or behavior. *See* T.C.A. § 40-35-114(1). It is true that charges standing alone cannot be used to enhance a defendant's sentence. An arrest or charge is not considered evidence of the commission of a crime. *See State v. Miller*, 674 S.W.2d 279, 284 (Tenn. 1984). A trial court should not use evidence merely showing arrests, without more, to enhance a sentence. *State v. Newsome*, 798 S.W.2d 542, 543 (Tenn. Crim. App. 1990). There was no evidence outside of the document included in the pre-sentence report concerning Appellant's prior criminal history or convictions. Therefore, this evidence alone is not sufficient to support the consideration of this enhancement factor.

The trial court also applied enhancement factor (4), the victim was particularly vulnerable because of age. *See* T.C.A. § 40-35-114(4) The victim in this case was one day shy of being two months old. Even though the age of the victim is an element of the offense

of aggravated child abuse, this does not necessarily preclude the application of this factor. *State v. Walton*, 958 S.W.2d 724, 728 (Tenn. 1997). The Tennessee Supreme Court has held that the particular vulnerability of a victim to a crime is an applicable enhancement factor, "if the circumstances show that the victim, because of his age or physical or mental condition, was in fact 'particularly vulnerable,' i.e., incapable of resisting, summoning help, or testifying against the perpetrator." *State v. Adams*, 864 S.W.2d 31, 35 (Tenn. 1993). It is beyond question that the two-month-old victim in this case falls into each of these enumerated categories of vulnerability. Therefore, this enhancement factor was properly applied.

The trial court also applied the enhancement factor (5), the defendant treated the victim with exceptional cruelty. *See* T.C.A. § 40-35-114(5). This court has upheld application of this factor in an aggravated child abuse case. *State v. Hodges*, 7 S.W.3d 609, 631 (Tenn. Crim. App. 1998). This court based this determination on our supreme court conclusion that "the element of 'serious bodily injury,' as included in the offense of especially aggravated robbery, does not necessarily constitute 'exceptional cruelty.'" *Id.* (quoting *State v. Poole*, 945 S.W.2d 93, 98 (Tenn. 1997)). Our supreme court went on to state in *Poole* that "the facts in a case may support a finding of 'exceptional cruelty' that 'demonstrates a culpability distinct from and appreciably greater than that incident to'" the charged offense. 945 S.W.2d at 98. In the case at hand, the doctors testified that the amount of force applied to the victim was equivalent to the force that would have been felt in an automobile accident. The victim had multiple fractures caused by either pulling or twisting her limbs. These fractures were in addition to a fractured clavicle and fractured ribs. The victim also had a punctured duodenum. Add to this, when Appellant noticed that the victim was having trouble breathing, he did not immediately call 911. Instead, he called the victim's mother who urged him to call 911. Even then he did not call 911 and instead called the victim's grandmother. *See State v. Marktrail Lee*, No. W2008-02278-CCA-R3-CD, 2009 WL 2581270, *8 (Tenn. Crim. App., at Jackson, Aug. 21, 2009) (holding that the exceptional cruelty enhancement factor applied when the victim suffered multiple injuries and defendant waited to call 911 and did not seem upset). We conclude that this enhancement factor was properly applied.

The final enhancement factor applied by the trial court was (14), Appellant abused a position of private trust. *See* T.C.A. § 40-35-114(14). With regard to this enhancement factor, our supreme court concluded in *State v. Gutierrez*, 5 S.W.3d 641(Tenn. 1999), that "[w]here the adult perpetrator and minor victim are members of the same household, the adult occupies a position of 'presumptive private trust' with respect to the minor." 5 S.W.3d at 645. Appellant was the victim's father and living in the house with the victim and her mother. In addition, Ms. Pegg testified that Appellant specifically moved into her house in order to care for the victim while Ms. Pegg was at work. Clearly, this enhancement factor was properly applied.

As for Appellant's argument that the trial court should have applied the fact that Appellant called 911 and administered CPR as a mitigating factor, Appellant did not make this request at the sentencing hearing. While it may be arguable that these actions should be considered in sentencing they are entitled to little weight in this Court's opinion given the cruelty of Appellant's actions.

Appellant was convicted of aggravated child abuse, as Class A felony. The trial court determined he was a Range I, standard offender. The sentencing range for a Class A felony for a Range I, standard offender is fifteen to twenty-five years. The trial court enhanced Appellant's sentence by five years to twenty years. The record before us amply supports that decision.

## **CONCLUSION**

For the foregoing reasons, we affirm the judgments of the trial court.

_____
JERRY L. SMITH, JUDGE